484    *FAYETTE HILL, plaintiff in error, v. THE STATE OF GEORGIA, defendant in error.

(Atlanta, January Term, 1871.)

1. INDICTMENT—ALTERATION AFTER ARRAIGNMENT—MOTION FOR VERDICT OF ACQUITTAL.—When a party has been arraigned upon a good bill of indictment, and the jury empaneled and charged with the case, and the Solicitor General altered the indictment in the presence of the foreman and some of the grand jury:
*Held,* That a motion for verdict of acquittal ought not to have been granted by the Court, although the act of the Solicitor General was unauthorized and improper in the premises.

2. SAME—EXCEPTIONS MUST BE MADE IN WRITING PRELIMINARY TO TRIAL—WAIVER.*—Under the Code of this State, all exceptions to the indictment for form, or for matters that may arise by special demurrer, or by plea in abatement or in bar, must be made in writing preliminary to the trial, and if not made at the proper time, are to be held as waived in contemplation of law.

3. EVIDENCE—READING OF TESTIMONY TO WITNESS—CORRECTION.—When the Judge below caused the witnesses to have their testimony read over to them, to be corrected, if necessary, in presence of the jury, or where the Judge himself suggested corrections of what had been sworn:
*Held,* That this practice is not error, and that it is the right and privilege of the Judge below to direct the progress of the trial, and see that the evidence is correctly taken down.

4. SAME — DYING DECLARATIONS — ADMISSIBILITY. — When a dissolution is approaching, and the dying man has lost hope of life, and his minds feels the full consciousness of his condition, the solemnity of the scene gives to his statements the sanctity of truth, and such dying declarations, when made, should be admitted in evidence and considered by the jury, under the charge of the Court upon the law applicable to them.

5. LEADING QUESTIONS—DISCRETION OF JUDGE—APPELLATE PRACTICE.—Leading questions, under section 3809 of the

---

*INDICTMENT—EXCEPTIONS MUST BE MADE IN WRITING PRELIMINARY TO TRIAL.—Special pleas in bar in a criminal case must be made in writing and filed on arraignment before pleading to the merits. It therefore follows that there was no error in the refusal of the court to allow evidence tending to show a former conviction, while the case was at issue upon the plea of not guilty; nor was there any error pending the trial of this issue in refusing to allow the defendant to file a plea of autrefois convict. Hall v. State, 103 Ga. 403, 29 S. E. Rep. 915, citing Hill v. State, 41 Ga. 484.

SAME—SUFFICIENCY.—"Upon the subject of the sufficiency of indictments in alleging the mode and manner of committing the crime, see Studstill v. State, 7 Ga. 16; Hill v. State, 41 Ga. 501; Peterson v. State, 47 Ga. 524; Coxwell v. State, 66 Ga. 309; Thomas v. State, 71 Ga. 44." Hicks v. State, 105 Ga. 629, 31 S. E. Rep. 579.

Code, are within the discretion of the Judge, for the purposes of justice, and when the presiding officer of the Court permits them to be propounded, this Court will not interfere to limit or restrict the Judge in the exercise of his legal discretion.

6. EVIDENCE—WOMAN COHABITING WITH MAN UNDER PROMISE OF MARRIAGE—COMPETENT WITNESS.—If a woman cohabit with a man, under his promise to marry her legally, but finding that he does not take legal steps to do so, quits him and again cohabits with him, she is not his wife and is a competent witness on his trial for crime. (R.)

7. RECHARGE OF COURT—REQUEST OF JURY—AFTER JURY RETIRED.—When the jury, after retiring to their room, requested the Judge to recharge them, upon some point of law in the case, and the Judge summoned them into Court, and in the presence of the counsel and accused complied with their request:

Held, That such act was not error, but was proper in the discharge of his official duty.

8. CHARGE OF COURT—LAW PRESUMES MALICE IN HOMICIDE—BURDEN OF PROOF.—When the Court, in a case of homicide, charge the jury that, when a killing had been committed, the law presumed malice, and it was incumbent upon the defendant to show there was no malice:

Held, That this charge was a well settled rule of law.

*9. SAME—UPON ALL GRADES OF HOMICIDE—ONLY GIVEN WHEN WARRANTED BY FACTS.†—When the defendant's counsel requested the court to charge all the grades of homicide, and the facts showed that the case did not rest for the defense upon all the matters of law governing homicide:

Held, that it was not error in the court to refuse the charge as requested. It is only in cases where the facts require such charge that it should be given.

10. SAME—OMISSION‡—SUPPLIED BY MORE FAVORABLE CHARGE.—When the omission to give a charge by the Court is supplied by the Judge giving a more favorable charge than the law of the case authorized:

Held, That this omission was not error.

11. LAW IMPLIES MALICE FROM WANTONNESS AND RECKLESSNESS—EVIDENCE TO SUSTAIN VERDICT.—When the facts of the case show that the prisoner shot at the deceased and killed him, although no motive of anger or provocation is proven, the law will imply malice from such wanton and reckless trifling with human life, and when the evidence sustains the verdict of the jury, this court will not set aside their finding.

---

†CHARGE OF COURT—WHEN UPON ALL GRADES OF OFFENSE.—On the trial of a defendant for murder, it is the duty of the court to give to the jury the definition of each grade of homicide, and also the law of justifiable homicide, provided the testimony will authorize it; but where there is no evidence whatever on which the jury could base a verdict finding defendant guilty of involuntary manslaughter, the failure to charge on that subject is not error. Freeman v. State, 70 Ga. 736.

The principal case is cited to the same effect in Turner v. State, 78 Ga. 180. See foot-note to Washington v. State, 36 Ga. 222.

‡SAME—OMISSION OF CHARGE.—In a criminal case the judge should instruct the jury that the evidence, to authorize a conviction, should be of such conclusive character and tendency as to exclude reasonable doubt, and a failure so to charge will cause a new trial, although the attention of the court may not have been called to the omission. Richardson v. State, 70 Ga. 825, citing Studstill v. State, 7 Ga. 3, 13; Bowie v. State, 19 Ga. 1, 2, 6, 7; Brown v. State, 28 Ga. 200, 216; Farris v. State, 35 Ga. 241, 242; Hill v. State, 41 Ga. 485, 505.

Criminal Law. Evidence, etc. Before Judge Clark. Sumter Superior Court. August Special Term, 1870.

Fayette Hill was indicted for the murder of John Wormack 'in said county, on the 1st of August, 1870, with a ball shot from a pistol. The indictment, as originally written, charged the assault on said day in usual form, and in charging the death said Wormack "within one year from the day first aforesaid," died. Before the trial, but when did not appear, Mr. Whiteley, the Solicitor General, had stricken out said quoted words and in lieu of them had interlined "then and there." After the defendant had been arraigned and had pleaded not guilty, after the jury had been empanelled and sworn and the Solicitor General had "opened the case" to the jury, counsel for defendant moved for a verdict, because of said alteration in the indictment, and proposed to prove that this alteration had been made after the bill was found and returned into Court, and without the authority and consent of the grand jury, or any twelve of them. The Solicitor said he made the alteration in the grand jury room, in the presence of the foreman and others of the grand jury, and with their consent; that he could not say how many grand jurors were present, nor that twelve were present. Nothing else was offered on this point. The Court overruled the motion and ordered the trial to proceed.

486 *The witnesses pro and con were then examined and their testimony was as follows:

Dr. W. M. Hardwick, sworn for the State: I am a practicing physician. I knew John Wormack in life. I was called to see him some thirty-six hours after he was shot. The ball entered just below the shoulder-blade and came out in the breast. It was a gun-shot wound. I cut out the ball. Never saw weapon—can't say whether it was a gun or pistol—it may have been a rifle or pistol. When I first saw him, deceased seemed to be so quiet I thought he was doing very well, except as to his pulse which was very feeble and quiet. In consequence of his condition otherwise, I at first thought the condition of his pulse might be attributed to the shock on his nervous system. I came to the conclusion that the ball may have struck a rib and passed around the body, and not struck any vital part, and more than that there was no hemorrhage from the lungs. On my second visit, the second day afterwards, he was in such a condition I was afraid he would die. Negroes had employed Dr. Bayley, and in waiting for me did not send for me until second day. On my visit at that time his pulse was still very feeble and had considerable fever; my conclusion was he would die. I think, from what I saw in my attendance on him, he died from the wound. I never saw him afterwards.

Cross-Examined: He lived four or five days after I last saw him. I left him in the hands of Dr. Bayley, and saw him no more. I did not probe the wound; can't say whether the ball

went through him straight or round the rib; don't think it could have been probed at the time. It went under the left shoulder blade and was taken out of him opposite; between those points is the covering of the heart and its surroundings. The wound was not bleeding when I saw it; when I cut out the ball it bled a little; it would not necessarily bleed if it struck the pericardium, but if it passed through the auricle of the heart, death must have ensued immediately. Any blow, whether it strikes a vital part or not, would affect the nervous system to a greater or less degree. Deceased was named John Womack; I heard from reputation they *were related as brothers-in-law; were friendly so far as I know personally. Don't know the distance of their houses apart; could not say. I did not see him shot; saw him with a gun-shot wound; don't know positively when he was shot; saw him twice. He must have lived seven or eight days after I heard he was shot.

Dr. David Bayley, sworn for the State, said: I belong to the Electric school of medicine; am a practicing physician; knew John Womack in life; attended him when wounded. Dr. Hardwick was first in attendance. I attended him afterwards. The wound was from a pistol shot, in the left shoulder, that came through his body. I was called on the night of the 25th July, 1870; did not come until next day, until after Dr. Hardwick had extracted the ball. The wound was caused by a ball that was a pistol ball."

Cross-Examined, says: I did not see him until after Dr. Hardwick did.

Re-Examined by the State: I had a conversation with the deceased as to the cause of his death. He did not say anything that induced me to think he believed his end was approaching. I didn't tell him whether I thought his wound was mortal or not. He said nothing to me on the subject at that time that indicated what he thought on the subject. He did not, even when dying, say anything on the subject, up to two hours before his death that would indicate he thought he was dying.

Joseph Mann, sworn for the State, said: I knew John Wormack in life. I saw him about three hours before he died; he was in a dying condition; he gave me to understand he was dying. Says he to me: "Am I to die in this way without anybody doing anything for me;" somehow that way, don't know exact words. He died at two, and I left him at eleven. His breathing was labored; he could hardly breathe; I saw that death was on him at that time."

Cross-Examined: Doctor David Bayley was there at that time. He was not present when the conversation took place; had a second interview with him. Doctor David Bayley left about the same time I did. He was out at his *buggy, and I went back with Mr. Bass to find out

Hill v. The State of Georgia

more fully about it. I am not a physician; saw him no more after I went away second time; staid that time about fifteen minutes; I went back to ask him more fully some things that I was not satisfied about. I think the words, "am I to die" were spoken when I was in the second time. I wanted to console the dying man, and when he asked me if I though he would die, I said I reckon not.

Miles Bass, sworn for the State, said: I knew John Wormack in life. I saw him about seven o'clock in the morning, and I understood that he died in the evening about two; it was about the 6th or 7th of August, I think; he appeared to be in his right mind, but I thought he was sinking; I think he was conscious that he was dying; he asked me if we were not going to do anything with Fayette Hill for killing him; he made several remarks that would show that he thought he was dying; he said he was so weak he could not talk; that he would like to talk to Mr. Mann if he was able. This statement was made about eleven o'clock, at which time I was there with Mr. Mann; I don't recollect he made any other remarks; I told him he was very low and I did not think he could live, he was sinking so fast; said he did not think so either; this was at seven that morning.

Cross-Examined, said: This conversation was not in the presence of Dr. Bayley; Dr. Bayley was at his buggy, and Mr. Mann and I went back; Mr. Mann did the talking then; I don't recollect of saying anything then; I might—don't recollect. In the seven o'clock conversation it was when he asked me if we were not going to do anything with Fayette for killing him.

Re-Direct: I said to Mr. Mann, in the presence of the dying man, what ever you want to say to this man say it pretty quick, as he wont live long.

Re-Cross-Examined: This was while Bayley was out; while Bayley was in he did most of the talking, and when Mann and I were in there while Bayley was out, Mann did the talking; I don't recollect saying anything more than already *stated; I may have said something to John, but don't remember, positively.

Re-Direct: In the conversation, at seven o'clock that day, deceased said to me, (I was sitting in my house, by the door,) he said that Fly Crawford was at Fayette's house and called deceased. This conversation I am about to relate took place after he asked me if we were not going to do anything to Fayette Hill for killing him.

Re-Cross-Examined: He seemed to know he was going to die; he was very weak.

Re-Direct: When I first arrived I said, good morning. Hallo, John, is this you? I had no idea it was you that was shot; I told him I thought he was mighty bad off; said he, "Yes sir," and said

then, "Mr. Bass, ain't you all going to do anything with Fayette for killing me?" I told him I did not know that he wanted us to do anything to him, as I had heard he was shot accidentally; he said he was sinking, and had been since the turn of the night. This was a few minutes after I got there. We talked on a little while before we made those remarks about sinking; the statement we made about the shooting was after these remarks about his sinking; said he got up and started to Fayette's house; his wife said, "John, I wouldn't go up there."

Re-Cross-Examined: These statements were made after he made the remarks about sinking. He told me he had been shot and I saw his condition was dying. He then went on and told me how it happened. He said he was sinking and had been since the turn of the night. This was before he told me about the fight.

Re-Direct: Says he said to his wife, "oh hell! you are mighty scarry; I am going." He said that when he got to the door Fayette was lying in the bed behind his (Fayette's) wife. He saw the pistol presented in the direction of the door—said he threw up his hands and hallooed "oh Lord!" and jumped out of the door—got about fifteen steps and the pistol was fired. He hallooed "oh Lord! Fayette, you have shot me;" said his wife then helped him to the house; *said he suppose Fayette was in his house when he shot. He said he was about fifteen steps before he was shot.

Re-Cross-Examined: One of the boys, Taylor Adams, asked me to go in and see the wounded man. His wife and mother-in-law was with him; I don't know how long after he was shot; had only heard he was shot; I asked him if he supposed Fayette Hill called him out to shoot him. He said Fayette was mean enough to do anything. This was when I was there the first time in the morning. He said nothing about an agreement with Fayette to split rails that night. He said Fly called him to Fayette's house. I don't recollect whether I said anything to him that day at eleven o'clock or not; may have said something but don't recollect. He said he wanted Mr. Mann to come there. I was satisfied that he would die. Don't know why I asked him again at eleven o'clock.

Hester Womack, a negro, sworn for the State, said: I live at Mr. Slappy's, don't know what county, this county I reckon. He was my husband; I was at my house at the time of the shooting. Don't know exact distance between my house and Fayette's, about as far as from here to corner of Court-house fence. The shooting took place on Monday night; don't know what month, August, I reckon, this year, on Mr. Slappy's place. I have been knowing Fayette going on two years. I didn't hear Fayette making threats about my husband. I know about Fayette carrying a pistol; I can't say what he bought it for; he said he bought it to shoot me and my husband. This was said about a month before

the shooting. Fayette told this to Taylor, Edwards, Fly and my husband. I was at the house; I did not hear him say it myself; my husband told me. I don't know exactly how long he had the pistol before the shooting. I know he had it. My husband didn't fall when shot; I got to him before he fell. I was at my house fire before the difficulty. I heard some one call my husband. Fly Crawford called my husband; says he, "Come here and look at Fayette lying down in the bed." I went in the house when he pointed the pistol; was not in Fayette's house when the *pistol shot. I ran to my husband when he hallooed "oh Lord! Fayette you have shot me." Fayette says, "is I shot you sure enough, John?" John says, "yes, you have." When Fly called my husband, I don't know that any body spoke to him immediately afterwards; I did not hear if they did. When husband got done eating his supper, I told him I would not go to Fayette's house. He said I was always talking foolishness to him, and that he would go and see what Fly wanted with him. When I got to him after he was shot, he was half way to my house. I don't know exact distance. It was about as far as cross this room.

Re-Direct: This occurred after supper. I had a great big fire-light in the yard right before my door. My door stood in one direction and Fayette's door was facing my chimney at right angles. The fire was right before my door. When my husband came out of Fayette's door, he was coming toward the fire, right towards my house. Don't know exactly how far he was from the fire when he was shot. I heard the alarm and ran towards him; didn't measure the steps. He hadn't got quite to the mulberry tree; if he had he would have been half way. The fire was in front of him as he came towards my house. I carried him to my house after I got to him; my step-father helped me.

Cross-Examined: I have had no conversation with any one about this case since coming to town but Mr. Callaway. This was after Court adjourned and I had been sworn. John and Fayette were not brothers-in-law; Fayette lived with my sister. On the day before this fiight, John and Fayette was working together next to Mr. Drivers. They was plowing together all the week before that until the rain, and then went to hoeing. My husband did not split rails. We never visited Fayette and my sister much; did sometimes and they did us sometimes. I saw Fayette buy the pistol; he bought it from Gus at Farmer's house. Gus lived about Anderson. This was about a month before the shooting. John lived a week after that night. It was a day before the doctor got there. Dr. Hardwick came next morning. He *cut out the ball; put clothes on to stop up the hole. I did not know what to do until the doctor came. I put wet cloths on the sore; that was all I did for him. I saw Mr. Bass there before John died. Mr. Bass came in the house

and told John howdy; said he didn't know it was him or he would have been there long before. John then up and told him how it happened. Couldn't tell him right straight; talked between breaths, and told him how it happened first thing. That mulberry tree wasn't a mulberry tree: it was a fig tree. Fayette's bed was back 'tother way from the house. From his bed in the corner, he could look from the bed and see my house. Is not a cross-eyed man. The door of Fayette's house opened towards his bed. He could look out from his bed and see my house. Could not see his bed from the inside of my house. When I went out of my house I could see his bed through his door. I did not see him shoot my husband. Fly was in Fayette's house when he called my husband. Fayette was in there on the bed, undressed. His wife had been there all the time. I told John not to go; he said he would go and see what Fly wanted. The next thing I heard was the pistol, and ran towards my husband, and this is all I know about it. I built the fire near my door, about as far as from here to the table. I cooked supper and kept up a big light.

Taylor Edwards, negro, sworn for the State, said: I knew John Wormack in life. Have been knowing Fayette about five years. I live on Mr. Slappy's place. I know Fayette owned a pistol this year. I knew when he got it. He had it, as near as I can come about it, six weeks before the shooting. After the pistol was bought, it was not very long before he did the shooting. After he bought it he said he did it on purpose to shoot John. He said it in my presence and several others. But none of them are here now but me and Fly. He had the pistol about two weeks before he made this threat. Mr. Slappy's place is in Sumter county.

Cross-Examined: I was present when John and Fayette was disputting. They made friends after that to my knowing. They didn't visit much, but some, after that, and *worked together after that. All that saying about buying the pistol to shot John was in the dispute, and they made friends and worked together after that. Fayette did not wait on John after the shooting in my presence. My arm was sore and I was about the house a good deal in the day time.

The State rested the case here, when the defense introduced the following evidence:

Fly Crawford, negro, sworn for the prisoner, said: I knew John Wormack in life. I know Fayette; these two always seemed to be very friendly, except one little difficulty, and they made that up. They were friends after that fracas 'til the night of the killing. This fuss occurred about six weeks before the killing; at the time the killing took place, I don't suppose there was any difficulty between them. If they did, they did not show it on that night. When this thing took place, Fayette, the first thing he did, was to

present the pistol at me. I said, "what in the devil do you point that thing at me for, and it heavy charged like it is?" Fayette was lying undressed in his bed. His bed was up in the corner. Where he lay in that bed he couldn't see John's house unless he got up and went to the door. When the pistol was pointed at me there was no difficulty between me and Fayette; the pointing was in play, and in a "rowdy, bruising" way as he often done, pointing and shooting amongst people. These boys had often been playing in this way with pistols, and me and Mr. Slappy had cautioned them against it, as it would cause some accident or trouble first or last. When John came out there and got in the door, Fayette presented the pistol at John. John said "oh! don't point that damn thing at me," and whirled his back. He started back out of the door, and Fayette jumped up out of his bed and ran to the door; he stumbled before he got to the door, but by the time he got to the door he was straight, and about that time the pistol went off and John said, "Fayette, you have shot me." This did not alarm me as I had seen them projicking so much in that way. No body told me to call John out there; I first called him. After the pistol went *off, Fayette stood still about a moment, and after John said "Fayette, you shot me," Fayette said, "did I shoot you sure enough, John?" and Fayette said it was accidentally done. Fayette made a stumble over a little box he had there. The report of the pistol took place after the stumble. He was going on to the door; just as he got to the door he got straight; he held up his hand and the pistol went off just as he got straight. He had recovered from the stumble; he did not hold the pistol like he was going to shoot while he was going to the door. John was about sixteen or seventeen steps from Fayette's door when he shot. I am John's father-in-law. The houses are about twenty or thirty yards apart. John was about half-way between the two when shot. After the shooting, Fayette went after the doctor; in about one half hour afterwards. I went and told Mr. Slappy and he sent him right after the doctor. I helped him to catch the mule and we put him on and sent him right off. He got back about ten or eleven o'clock. He put up the mule and this woman asked him to cut her a turn of lightwood. He did so and put it in John's house and then went to his house. He staid right at home all the time until arrested.

Cross-Examination: Mr. Slappy is in charge of the place; he sent John after the doctor.

Re-Direct: We are cropping together with Mr. Slappy; get a part of the crop.

Re-Cross-Examined: When Fayette pointed the pistol at me he said, "It's got three balls apiece in here for you and John."

Re-Direct: He was laughing at the time, and when I said, "Don't point it at me," he said, "I've only got three balls apiece

for you;" I only went to Fayette and told him, if we are going to work it is time to go; I called to John and told him the fix Fayette was lying in.

Ann Crawford, negro, sworn, for the prisoner: defendant is my husband.

Cross-Examined: I have never married defendant; we promised to marry each other; been living together since last year; he asked me to be his wife and I promised to do so; he *said he would get license and marry me according to law; I lived with him until I found that he wouldn't get the license and then quit him—I quit him before the difficulty—I quit him the last of last year.

Direct: Fayette was lying on the bed; Fly called John and John came up and said, "What do you want?" and Fly said, "Here is Fayette in his shirt-tail;" John came and Fayette motioned the pistol at him—just so; John says, "Don't point that thing at me and it heavy loaded;" Fayette went back and lay down on the bed, and John came back in the house and he motioned it at him again; he got down off of the bed and stumbled his foot, and before he got to the door he liked to fell; the pistol went off twice; Fayette got to the door; he was half bent when the pistol went off; he stumbled over a box; Fayette said he would not have done it for nothing in the world; said he would rather it was him than John; John had said, "Fayette, you have shot me," and Fayette said "Did I shoot you, sure enough," and then said what I have stated; they looked to me like they was as friendly as could be.

Cross-Examined: I can't tell when I quit Fayette; I went back about two months ago; he hired me to cook and wash for him; I was living with him at the time of the difficulty; I was on the bed with him but he did no go any furher; I don't exactly know how long Fayette had the pistol; he was always playing with it with some of them. John came to the door twice; Fayette pointed the pistol at him both times; the first time he was on the bed, and the next time he jumped up and sat on the side of the bed.

Direct: I am sister to John's wife.

Prisoner's statement: I shot John Wormack, but I did not intend to do it; I had nothing against him any more than if he was my brother; John came into my house, and the second time that I pointed the pistol at him I jumped up and stumbled over the meat box and the pistol went off—it was all accident; I had no intention to kill him; had nothing against him, and we was as friendly as if he was my brother. This is all about it; I am here now, and you can do what you please with me.

*And after argument had, and the charge of the Court, the jury retired and rendered a verdict of guilty.

Defendant's counsel moved for a new trial, upon the following grounds: 1st. Because the Court erred in not allowing a verdict

Hill v. The State of Georgia

of acquittal by the jury because of said alteration in the indictment. 2d. Because the Court ordered the testimony of Dr. Hardwick, Dr. Bayley, Miles Bass, Taylor Edwards, Ann Crawford and Fly Crawford, respectively, to be read over to said witnesses respectively, by the Clerk taking-down the evidence, after 'the witnesses respectively had been told by the Solicitor to come down, and had come down from the witness stand. The Court ordered said witnesses respectively, to stop at the Clerk's desk and have his or her testimony read over in the hearing of the jury, counsel for defendant then and there objecting to the same. 3d. Because the Court, during the reading of Hardwick's testimony, interrupted the reading and said, "the witness said he was wounded under the left shoulder blade, counsel for defendant objecting that it was improper for the Judge to say what had been proved. 4th. Because the foundation laid by the evidence was not sufficient basis for giving in the dying declarations of Wormack, especially those made at 7 o'clock, a. m. 5th. Because the Court allowed the Solicitor to ask a witness, "Didn't he tell you before you said anything to him that he was in a dying condition, and didn't he know he was in a dying condition before he told you," and he allowed the question answered, notwithstanding the prisoner's counsel objected to it as a leading question, and insisted that because the Solicitor had asked a leading question the witness ought not to be allowed to answer, though the form of the question should be changed.

6. Because when the defense introduced Ann Crawford, the State proposed to ask her if the defendant was not her husband, or if she was not living with him, defendant, by his counsel, objected because answers of witness would tend to criminate herself, and because upon the preliminary examination of said witness, and her testimony that defendant and her had "promised" to each other, and had been living together *and cohabiting, and upon the point being made by the State that their promise and cohabitation was in law a sufficient and legal marriage to place witness within the exception of the late law enlarging the rule of admission of evidence. The Court, after argument, stated that he was prepared to hold that consent and cohabitation constitued a valid marriage in Georgia, but not in this case. The defendant agreed to get license and did not do so, and it would seem, therefore, that he contemplated that a license was necessary, and as the woman left him as soon as she found it out, it was not a valid marriage. The Court overruled the State's objections to the witness, and allowed her to testify, by which ruling the evidence of the witness was invalid or virtually destroyed before the jury.

7. Because the Court charged that, when a killing had been committed the law presumed malice, and it was incumbent upon the defendant to show there was no malice.

8. Because the Court refused, after being requested so to do by defendant's counsel, in writing, to charge the jury as to the different grades of homicide other than already had been done.

9. Because the Court, after the jury had retired on the case, remarked to the jury that he would remain about the square until dark and return soon after tea, and thus left the Court-house, and after supper he was informed by the jury that they desired some portion of the charge restated. Colonel Brown, counsel for prisoner, was in the Court-room at the time, and knew all the facts, proceeded to the Court-house and ordered the jury again into the Court-room and recharged them without the consent of the defendant, or of his counsel being first had.

10. Because the Court erred in charging the jury as follows: "If the defendant rests his defense on the ground of accident, he must prove to your satisfaction that there was no evil design, or intention, or culpable neglect. * * * But if you believe from the evidence that the defendant presented the pistol at or toward deceased, and fired it and wounded deceased, of which wound he died, he is guilty of murder. And *if such are the facts, it makes no difference whether he shot in sport or in earnest, or whether he was friendly with deceased or his enemy, the law implies malice—the law presumes that he intended to kill, although the deceased may have been his dearest friend. It holds him responsible for the full consequences of his act, whether he so intended them or not, and any subsequent sorrow or remorse for the deed cannot palliate the offense or relieve the defendant from the consequences of his act. The law, if such are the facts, fixes upon him the crime of murder, and an ocean of tears cannot wipe out the crime. Counsel for the State have stated to you that upon your recommendation to mercy the Court will commute the punishment. It is my duty to say to you that such is not the law. It is not your province to recommend to mercy, not the Court's to commute, except in those cases where conviction is procured on circumstantial evidence. Your verdict will be guilty, without any recommendation to mercy, or not guilty."

11. Because the jury found contrary to the evidence and contrary to the evidence and the law.

The Court refused the new trial. Prisoner's counsel filed a bill of exceptions, stating the facts only as aforesaid, which the Court certified to be true, only as corrected by the following.

Notes by the Judge:—1. The motion for a verdict was made after the jury was empanelled and sworn, and after the Solicitor General had opened the case before the jury.

4. It is not true that the witness were "discharged." At the close of the examination of the several witnesses, they were or-

dered to advance to the Clerk's table and listen to the reading of the evidence, as taken down by him, and correct mistakes if any.

5. The Clerk, in taking down the testimony of Dr. Hardwick, omitted the word "blade," and in reading over to Dr. Hardwick, the Court suggested the omission. Dr. Hardwick agreed with the Court, and the word "blade" following the word "shoulder" was inserted.

*6. The testimony of witness Bass will show at what time the dying declarations were admitted, as the testimony is very accurately reported by a very intelligent member of the bar, acting as Clerk, and in the order in which the statements of witnesses were made. As will be seen by reference to the testimony, the Court allowed a very extended preliminary examination, and even after the witness had commenced his statement about the dying declarations, allowed prisoner's counsel to examine him with a view to greater certainty. The Court allowed the leading question, because the witness, though an honest man, seemed somewhat confused and dull of comprehension.

It will be seen by reference to the testimony of Ann Crawford, that the question of her marriage with prisoner was made after the preliminary questions by counsel for the State and prisoner. The Court, after argument, decided the question in favor of the competency of the witness, and made the statements as set forth in the 11th ground in the motion for new trial.

13. The Court, upon being informed by the sheriff that the jury wanted instructions on a question of law, ordered the sheriff to summon into Court, one, at least, of the attorneys for the State, and one, at least, of the attorneys for the defense. The Solicitor General and Colonel Jack Brown appeared in Court. Colonel Brown, counsel for the prisoner, waived the presence of the prisoner. The Court then ordered the jury to come out the Court room, and, at the request of the jury, reread to them this charge.

In the 13th ground for a new trial the Court has stricken out the words, after the jury had returned with the case, and inserted them again, by interlineation, the words, therefore stand, but the statement is not true. The jury had not "retired with the case." The court called their attention and made the remarks as they were leaving their box. It was about sun-down when they were charged with the case, and some two or three hours later when they were called into the Court to hear the charge reread to them. The presence of the prisoner was also waived by his counsel, when the jury *returned their verdict. In addition to the charge, as stated in the bill of exceptions, the Court charged the jury on the law of murder and malice, as laid down in the Code, sections 4253, 4254, 4255.

Also, that "a person shall not be guilty of any crime or misdemeanor committed by misfortune or accident, and where it satisfactorily appears that there was no evil design or intention, or culpable neglect:" Code, section 4237. That if 'the killing was accidental the defendant was not guilty; that if defendant stumbled over a box, and in the act of stumbling or recovering, the pistol went off and deceased was shot, it was not murder, and the jury should return a verdict of not guilty.

The Court further gave in charge section 3728 of Code, on the subject of dying declarations; that they were the judges whether or not the deceased was in the article of death—whether or not he was conscious of his condition; as to the cause of his death. and the person who killed him; that if they were satisfied that he was in the article of death, and conscious, as stated, they should attach the same credit to his statements as to the testimony of a sworn witness.

Hawkins & Burke; Jack Brown, for plaintiff in error.

C. T. Goode; R. H. Whitely, Solicitor General, by N. A. Smith, for the State.

LOCHRANE, C. J.

This case- presents, by the record, some questions of great public interest, in the administration of the criminal laws of this State.

1. The indictment, upon which the plaintiff in error was arranged and plead not guilty, and upon which a jury were empanelled, was taken by the Solicitor General to the grand jury room, and in the presence of the foreman and some of the grand jury (number not known,) changed as follows: The indictment contained these words, "of which mortal wound the said John Wormack,· within one year from the day first aforesaid, died." The Solicitor General struck out *those words and inserted, "then and there" before the word died. We hold that the indictment as it originally stood was sufficient, and the alteration was both unnecessary and unauthorized.

2. There is nothing which should be more specially guarded by Courts than any interference with, or alterations of papers emanating from the grand jury. In receiving the indictments or presentments from that body the Solicitor General, by the customary inquiry, obtains, in open Court, the consent of amendment in all matters of form; but in matters of substance there is no hand can legitimately touch the indictment or presentment but by the direction and action of the grand jury. In this case the legal effect of this anomalous proceeding constitutes the basis of the first ground of error. The prisoner, by his counsel, after the case proceeded to the jury, moved for a verdict of not guilty, which was overruled by the Court. Was the Judge below right in overruling the

motion for a verdict of acquittal? We think he was. Waiving what might have been the judgment of the Court upon a motion to quash the indictment, or upon plea or demurrer thereto, we cannot hold that the motion for verdict was proper. We are not unaware of this practice having crept into the administration of the criminal law, and of many escapes from the penalties of crimes having therefrom. In fact, the usual mode of taking advantage of exception to indictments, is by motion to acquit, after the jury are empanelled and charged with the consideration of the case upon its merits. But the law does not authorize the practice. Section 4545 of the Code expressly directs that if the prisoner, upon being arraigned, shall demur to the indictment, or plead to the jurisdiction of the Court, or in abatement, or any special plea in bar, such demurrer or plea shall be made in writing, "and if decided against the prisoner, he may still rely on the general issue of not guilty;" and section 4536 is in these words: "All exceptions which go merely to the form of an indictment, shall be made before trial, and no motion in arrest of judgment shall be sustained for any matter not affecting the real merits of the offense charged in such indictment." *Under the law, we hold that the exceptions to an indictment must be made before the trial, on the general issue of not guilty. If they be matters of form, or such as may arise upon special demurrer, or upon plea in abatement or in bar, the law requires that they shall be made and adjudicated preliminary to the trial, and if not made them, they are held to be waived, in contemplation of law, and no motion in arrest of judgment shall be sustained. except upon some matter touching the real merits of the offense charged in the indictment. The spirit as well as letter of our law is, to blot out the technicalities and subleties, which ingenious device so often raises, to defeat the administration of justice. "Every indictment is deemed sufficiently technical, which states the offense in the terms or language of the Code, or so plainly that the nature of the offense charged may be easily understood by the jury:" section 4535, Code.

3. Error is assigned upon the direction of the Judge below to the witnesses, to hear their evidence read over to them in the presence and hearing of the jury. We do not regard this as error. On the contrary, it is both proper and legal for the Judge to have the testimony, as taken down, read over to the witnesses, so that they may correct any matter not properly understood, or omitted. Nor do we hold that the Judge must sit in criminal cases as an automaton and not open his lips in the direction of the trial. There is no office of higher responsibility than that of the Judge of the Superior Court, in this State. And the law clothes the Circuit Judges with the highest and most sacred powers; and in

all cases, both civil and criminal, it is not only their prerogative right but official duty, to watch the progress of the trials before them, and see that the laws are enforced without restraint. The law gives them power, for purposes of public justice, and its exercise is invoked to control and direct cases tried before them, and this Court will not limit the manner of its execution, in furtherance of substantial justice.

4. Neither do we regard the admission of the dying declaration, under the circumstances of this case, erroneous. The examination of the witness Bass was close and critical, in regard to the condition of the deceased, and his consciousness of approaching death, and came substantially within the rule of law upon this subject. When dissolution is approaching, and the dying man has lost all hope of life, and the shadows of the grave are gathering in around him, and his mind is impressed with the full sense of his condition, the solemnity of the scene and hour gives to his statements a sanctity of truth, more impressive and potential than the formalities of an oath—and such declarations ought to be received and considered by the jury, under the charge of the Court, as to their effect and weight, in all cases where the evidence of fact warrant their admissibility.

5. The permission of leading questions objected to in this case, was not error. Section 3809 of the Code gives to the Court a wise discretion, in allowing leading questions, when justice requires it. The law entrusts this power to the judicial discretion of the officer presiding at the trial, who is cognizant of the surrounding circumstances, and can perceive the necessity as it arises. No general rule, on this subject, could be laid down. Each case presents its own peculiar claim, and each must rest on the peculiar characteristics which invoke the Judges' discretion. This Court can only review its exercise, when it has been illegally abused.

6. In regard to the competency of the witness, Ann Crawford, we feel satisfied that the objection to her, on the ground of relationship, was properly overruled. The exclusion of the wife of a party is based upon principles of public justice, arising out of the sacredness of the domestic tie, which cannot be considered applicable to one whose condition did not involve this relationship. In her preliminary examination she says she had never married the accused, and she was clearly competent.

7. Touching a matter of practice, in this case, assigned as error, it appears that after the jury had been some time out, they sent a request to the Court to recharge them, which he did, having first caused counsel on both sides to be summoned, defendant's attorneys waiving his presence, and the Court read over to them his charge. We see nothing in conflict with law in this proceeding, which, from its frequency, may be regarded a practice of the Courts. Juries, under our Code, are judges of both the law

and facts, and, for myself, I feel no hesitancy in entrusting to honest men the application of the principles of law governing the case, which, under their oaths, they are bound to apply; and where there is doubt, difference or misunderstanding of the law between them, the course is proper and right to explain to them the law by recharging them.

8. Having disposed of the matters of practice in this case, we now come to the law as charged by the Court. The Court charged the jury, that when a killing had been committed, the law presumed malice, and it was incumbent upon the defendant to show there was no malice. Was this error? We think not. That the law implies malice where the killing is proved, is a well settled rule, declared by all publicists, and which had continuous sanction by the repeated adjudication of Courts. This being true, the onus of removing such legal presumption is upon the defendant. If the converse of the proposition were true, then every killing would be presumed innocent, and under such a principle human life would, indeed, be like the flower of the field.

9. Again, it is objected that the Judge committed error in his refusals to charge. The request of defendant's counsel to the Court was to charge the jury as to the different grades of homicide. As will appear by the view we take of this case, this point in the record has invoked the most consideration. The adjudications of this Court have been read and pressed with earnestness. We have carefully considered the cases, and the circumstances under which each has been adjudged, and the spirit and principles of the decisions do not go to the extent claimed. We have not held that the Judge below must charge, in all cases, upon the various grades of homicide, but have qualified this general rule by this principle, that, in cases where the facts justify or require such charge, it shall be given. With or without request, it is the duty of the Court to present to the jury all the law applicable to the case, and if facts, however slender, support theories of the *defense, invoking any or all the grades of homicide, they must be given in charge. Errors of omission are as fatal as errors of commission. The Judges below are bound to know the law applicable to the case, and must give it in charge to the jury. This is imperative, and overwhelming in its convictions and direction of duty. But when the facts do not call for such general charge on all the grades of homicide, it is not the duty of the Judge to confuse and embarrass the jury with theories not warranted by the facts.

10. The facts in this case show that the deceased went to the house of the accused, being called there, and, he was at the door, the accused pointed his pistol and shot him. There was no quarrel or provocation; the defense accounted for the shooting upon the ground that he was in fun, and stumbling over a box, the pistol went off and killed de-

ceased. Upon this statement of facts, was it the duty of the Court to charge the various grades of homicide? We think not. The case presented was one either of murder from implied malice, in the wantonness of the act and its reckless disregard of human life, or it was accident. The Judge charged the jury upon the law of malice as found in the Code, and also, that "a person shall not be found guilty of any crime or misdemeanor committed by misfortune or accident, and where it satisfactorily appears there was no evil design or culpable neglect." There was but one view of the case the jury, under the facts, could have legally considered, and that was, on the theory of the defense, involuntary manslaughter, as defined in the Code, section 4261. By the review of this record on this subject, we find that the Court charged the jury, covering this subject, in language stronger and more favorable than the law which the request would have invoked. He charged "that if the killing was accidental, the defendant was not guilty, and if the defendant stumbled over a box, and, in the act of stumbling or recovering, the pistol went off and deceased was shot, it was not murder and the jury should return a verdict of not guilty." This charge went further in favor of the accused than the law; for if the defendant, pointing a loaded pistol at deceased, even in sport, to frighten him, in moving *towards him, had in fact stumbled, and by mischance the pistol went off and killed deceased, the consequence of such illegal act resulting in death would not have been guiltless; the accident would have removed the intent of malice, but the wantonness and the danger resulting from the act in death, would have been criminal.

11. The last question presented by the record, is whether the verdict is contrary to the law and the evidence. In 39th Georgia 34, this Court, in a case somewhat assimilating this by the analogy of its facts, where the defense insisted that the shooting was in fun, held, "that he had no right so to fire, whether in fun or in earnest. If the latter, it was express malice; if the former, it was implied. That sort of fun is not permitted among civilized people, and he who indulges in it is treated as though he intended the result of his act. It is trifling with justice to allow and weight to the remorse of this prisoner, after his reckless act had produced its result." This decision, in effect, decides the case under consideration. The record shows that this unfortunate prisoner, after he came into possession of his pistol, was in the habit of flourishing it with foolish bravado and reckless disregard of the peril and consequences that might result. On the very night of this sad occurrence, lying on his bed, he had this weapon as the plaything of the hour. He was "projicking with it," is the simple though rude expression of a witness who was present at the homicide. He pointed it at the witness, speaking of its having "three slugs apiece for him and for deceased." The deceased was at his own home when

called by the witness up to see prisoner. He went across the yard to the door of his cabin, when the prisoner pointed the pistol at him and shot him. We cannot say, under the law, that the verdict is against the evidence. The jury have passed upon it; they have regarded the act in the light of implied malice, resulting from the reckless disregard of human life exhibited. The weight of the evidence sustains the dying declaration of the deceased. The jury have so found, and on them was devolved the solemn duty of finding the facts. Upon no principle of law can we set aside their verdict; *and the lesson enforced by the administration of the law in this case may mark its influence on the future. The carrying of concealed weapons has already brought tears and trouble to the homes and hearths of many a family. This habit curses society by its pernicious influences, and we see no hope to protect the peaceable and law-abiding citizens but by inflicting the penalties consequent upon acts violative of the law, and, while clothed with judicial discretion to put aside the sword of justice, we will let all feel that it will fall on him whose act perils or destroys human life.

Judgment affirmed.