JAMES R. WILSON, plaintiff in error, *vs.* THE STATE OF GEORGIA, defendant in error.

1. It is not error in a Judge of the Superior Court to refuse to entertain a second showing, for the continuance of a cause, after a previous showing and judgment overruling the motion, unless in the second showing facts be stated, which, in the exercise of a sound judicial discretion, would take the case out of the operation of the 53d Common Law Rule of Practice—as *e. g.* the occurrence of a cause not existing when the first showing was made, or other cause, standing on the same footing of reason and justice.

2. New trial refused on the alleged ground that the verdict was contrary to law and the evidence.

3. Where, in charging the jury, the Court correctly states the law governing the case, but exception is taken to an illustration used by the Court explanatory of a legal principle, this Court will not narrowly scrutinize the illustration if satisfied that, whether right or wrong, it was not calculated to mislead, and did not in fact mislead the jury.

Murder. In Fulton Superior Court. Tried before Judge BULL, at October Term, 1861.

At the October Term, 1861, of Fulton Superior Court, an indictment was found against James R. Wilson, the plaintiff in error, and his father, John L. Wilson, for the murder of Thomas Terry, and at the same term they were jointly put upon their trial.

When the case was called the prisoners announced " not ready," and made in writing, under oath, the following motion for a continuance:

In open Court appeared John L. Wilson and James R. Wilson, who being duly sworn, depose and say, " that neither

of them are ready for trial at this term of the Court on account of the recent finding of the bill of indictment, and the public excitement and prejudice existing against them on account of the supposed commission of the offense with which they are charged, and the publications made in the Southern Confederacy at and after the time of the commission of the supposed said offence.

And they further swear, that they are not ready on account of the absence of Solomon Kent, Alston Ward, and Henry Stephens, for whom subpœnas have been issued, and who are absent from the Court without the leave or procurement of deponents, and that subpœnas were placed in the hands of J. C. Rosberry, a constable for said county, and he reports that he could not find them, and that he heard that Solomon Kent had gone to Virginia to the war, and that they were in this county when their subpœnas were issued, and that they expect to made diligent efforts to have them in attendance at the next term of this Court, and have made all exertions in their power to have them at this term of the Court. By Solomon Kent deponents expect to prove, that said Kent saw the deceased, Thomas Terry, strike the first blow on the head of John L. Wilson with the stirrup iron of a saddle, with the stirrup leather wrapped around his wrist, and commenced the fight without any provocation on the part of deponents. Also, that they have been informed by W. A. Wilson, the son and brother of deponents, who is now absent, that Alston Ward would be a good witness, and to have him subpœned, as he would be a good witness from what he had said to him.

Deponents further swear, that this application is not made for delay only, but to get a fair trial, and subserve the ends of justice, and that they cannot safely go to trial without said witnesses being present."

The motion to continue was overruled, and prisoners excepted. Judge Bull remarks as follows in regard to this motion : " This affidavit was made out and sworn to after the Court had decided upon another and previous one, in which not a single legal ground of continuance was contained,

and the only legal grounds contained in this were such as were suggested by the Solicitor General in arguing, or the Court in deciding upon the first showing.

The continuance being refused, the counsel for the prisoners, Messrs. Gaskill and Manning then and there, in open Court, abandoned the case, whereupon the Court appointed Amos. W. Hammond and Moses C. Blanchard, Esqrs, to represent the accused, they being unable to employ counsel.

### EVIDENCE FOR THE STATE.

W. A. KENNEDY sworn, says: I saw Thomas Terry at my house, in Fulton county, on 3d of August, 1861; Terry was going by up town; on his coming back, about five o'clock, witness was in his shop, Terry had passed by, Mr. Cowen was in shop with witness, and hailed Terry, Terry bid him good evening; witness also spoke to Terry, and asked him to light, Terry said he did not have time, witness remarked that he had received a letter from his son in Virginia; when witness told him this he readily got down, just as he got down, the Wilsons coming out of town, passed witness' window; Terry came to window and stood in it, the prisoners went on to the corner, where they overtook Mr. McDuffie, then went round and came back; Mr. Terry was already standing there, witness was reading the letter; they all stood quietly until witness had finished reading the letter, when Terry rather stepped back; Mr. Cowen said something to him about a saddle trade, and he and Terry went to about centre of the street; shortly after Terry turned around and came back to his mule, and about that time John Wilson spoke to him, and said he wanted to see him a minute; Terry turned off from his mule, and walked to where John Wilson was standing, and said to Wilson he could see him; Wilson let out with an oath, and about the same time struck Terry in the face with his fist, and Terry struck at Wilson with an old fashioned stirrup, the leather had no buckle, looked as if it had been hanging to the horn of the saddle; the lick did not seem to strike Wilson, but saw afterwards that it had; about that time James Wilson was close by, and had a

bottle, heard a crash, and saw pieces of bottle falling, James Wilson had the bottle; Terry fell, and John Wilson followed him up, and commenced beating him in the face; witness hallooed to a gentleman to part them, and no one doing so, witness threw down his work, and went out and parted them; John Wilson struggled hard to get loose, and swore he wanted to kill Terry, witness scuffled a good while to get him away, got him off, and witness turned to his son, who had knocked Terry down with the bottle, and told him he had better take John Wilson off from there; witness turned back to Terry; James Wilson was pulling his father down the street towards home; witness took Terry, who had gotten up, by the hand, and led him to witness' house; Terry seemed to be badly hurt, and bled freely, he tried to talk, but could not; at the suggestion of Mr. Cowen a doctor was sent for, who came about a quarter of an hour after; Terry complained of being sick, and wanted to lie down; Dr. Gilbert told him to sit mute, and examined his head; witness then took him into the house, and laid him down; he seemed to get worse until he died the next morning at a quarter past two o'clock; Drs. Gilbert, Beach and Brown came to see him; witness was asked a few days before, by James and Alston Wilson, if he had seen Terry go up town, they said a difficulty was between them, and they intended to whip him, Terry, if they could find him in town; they left the window and went up town; they said there had been a difficulty between Terry and Walton Wilson's wife, and that it was on account of abusing Walton Wilson's child, said Terry had whipped the child, and had threatened them and Mrs. Wilson, and that they intended to have satisfaction from him; after they returned, they said they had not seen Terry; Alston Wilson went up to his father-in-law's, and after he left James Wilson commenced talking about the difficulty between Terry and himself; he said they had had a difficulty some time before that, and that he had gone to Terry's house, and Terry came out, and brought a wagon spoke with him, " said he had a pistol, and thought it was concealed, but found it was not," he found he was not in a position to carry on a difficulty, and

went off; he did not renew it then, but said he was determined to have satisfaction of Terry, that if he could not get to whip him he would waylay him, and if he could not execute it that way, he would go to Terry's house and call him out, that he would have something, and pop would go something, and that would be satisfaction; said he was not as good a man as Terry, and when he met him he intended to keep cool; the bottle used was a large champagne bottle, the lower part quite thick, and it was heavy.

CROSS-EXAMINED—James Wilson never told witness that he intended to shoot Terry; did not see anything in the bottle used, did not see it until it was in pieces; did not see it strike Terry's head; heard the crash, which sounded like striking a hog—sounded dead; did not see prisoner have the bottle, did not see the lick struck with the bottle; Terry struck old man Wilson with the stirrup; he had the stirrup leather wrapped around his hand and over his wrist. When old man Wilson said, Mr. Terry I want to see you, Terry replied, you can see me now. When witness pulled old man Wilson off he smelt whisky.

JEROME BEERS testifies: that after the reading of the letter Terry started to his mule, when John Wilson said he had a word with him, and wanted him to step out in the road; Terry replied he did not want to have any fuss with him, and should not do it; Terry went to his mule, took his stirrup off, and then went into the road. John Wilson struck Terry first, I think, when Terry struck John Wilson, and then James Wilson struck Terry with a bottle and knocked him down; the bottle was a long champagne bottle, thick at the bottom. When Terry fell, the old man jumped upon and struck him several times with his fist; James Wilson and Kennedy took the old man off; James Wilson took hold of John Wilson before Kennedy came up.

CROSS-EXAMINED.—James Wilson had the bottle all the time; Terry took the stirrup off very quick, and approached the Wilsons a little faster than common.

McDuffie and Cowen were also sworn, but there is nothing in their testimony necessary to be inserted here. It was also

proven by the physicians that Terry's death was caused by the wound on his head.

The prisoners introduced no evidence, and the Court having charged the jury, they returned a verdict of "guilty," as to James R. Wilson, and of "involuntary manslaughter in the commission of an unlawful act," as to John L. Wilson.

Counsel for James R. Wilson moved the Court for a new trial, on the grounds,

1. Because the Court erred in not granting a continuance on the written application of the prisoners by their counsel, Manning and Gaskill.

(See the note of Judge Bull, *supra,* as to this ground.)

2. The Court erred in not granting a continuance on the additional ground that V. A. Gaskill, one of the attorneys for prisoners, stated to the Court, that by a conversation with a material witness for the prisoners, he learned that he was an important witness, and that he had sent him away to make arrangements to raise money to pay a fee, that he had not returned, and that therefore he, Gaskill, determined to abandon the case in open Court.

To this ground Judge Bull appends the following note : "There was no motion for continuance or postponment of the case on this second ground in the rule *nisi,* nor was the statement made till the Court had decided the motion for continuance. I regarded it as a matter personal to the attorney."

3d and 4th. Because the verdict was contrary to law and without any sufficient evidence, and without evidence.

5. Because the charge of the Court was erroneous in this: In the argument of the Solicitor General he contended if a person should shoot at a bird in a crowd and kill a man, it would be murder, and counsel for prisoners denied this proposition and stated, that if a man should shoot at a hog which he had no right to kill, and in so doing should shoot and kill a man, it might be murder, but not if he shot at a bird, which it was not unlawful to shoot at ; and the Court in its charge to the jury, amongst other things, said : " It is true," as it has been contended by the Solicitor General, " if a man

Wilson *vs.* The State of Georgia.

shoot at a bird in a crowd, and kill a man, it is murder, whether he intended to kill the man or not."

To this ground the Court appends the following: "The charge of the Court upon that subject was literally as follows, while reading and explaining the several clauses in the penal code in relation to the several grades of homicide, the Court remarked: "Men's intentions were ordinarily to be determined by their acts, and the declarations accompanying these acts. Therefore, if a man strike another with a weapon likely to produce death, and with sufficient force to produce death, the presumption is that he intended to kill, unless the evidence shows that the killing was involuntary.

But there are cases where the homicide is murder, though there may be no positive intention to take the life of the deceased. As if the killing happen in the commission of an unlawful act, which, in its consequences, naturally tends to destroy the life of a human being; for instance, for the sake of illustration, if a man in attempting to procure an abortion kills the woman without intending it, or, in the case put by the Solicitor General, if a man in a crowded thoroughfare, with a reckless disregard of human life, fire a gun at a bird in the direction of the crowd, at the manifest risk of killing some human being, although he may have had no particular malice against any one in the crowd, and no positive intention to take the life of any individual, yet if he kills a human being instead of the bird, under such circumstances it is murder. (I did not intend to give the exact words of the Solicitor General; the above was the substance of his illustration.) Or if a man in connection and acting together with one or more others, kills another in the prosecution of a riotous intent, or if he beats another in a brutal manner with a weapon calculated, when thus used, to produce death, and exhibits a reckless and wanton disregard of human life, though he may not intend to pursue his violence to a fatal termination, in all these cases though the killing be involuntary, yet the law makes them murder. The law is too tender of human life to allow it wantonly and capriciously hazarded."

The motion for a new trial was overruled on all the grounds therein taken, and this decision is alleged as error.

A. W. HAMMOND, BLANCHARD, for plaintiff in error.

N. J. HAMMOND, Solicitor General, *contra.*

*By the Court*—JENKINS, J., delivering the opinion.

After verdict against the prisoner, he moved for a new trial in the Court below on several grounds, which motion was overruled. The prisoner excepted to that judgment and alleges error upon each ground of the motion so overruled.

The two first grounds will be considered together, being predicated upon rejected applications for a continuance of the cause, when called for trial.

1. It appears from the record that the prisoner made two separate attempts to effect a continuance of his cause, the one immediately succeeding the other, or, in other words, he presented in support of his motion to continue, two distinct specifications in writing of the grounds relied upon, the second not having been presented until judgment had been pronounced upon the motion, as sustained by the first written showing. It further appears, that all of the grounds taken in the second specification existed, and must have been known to the prisoner, when his motion was made. No exception is taken to the refusal of the continuance asked, in so far as it overruled the grounds presented in the first specification. The insufficiency of those grounds seems to be tacitly admitted by the plaintiff in error. The question we are to consider is, whether the Court erred in overruling the motion on the grounds taken in the second specification.

We do not deem it necessary to look into the details of this second specification, nor to inquire, whether or not, had it been presented originally before a judgment upon the motion to continue had been evoked and pronounced, it should have been held sufficient. It was not overruled in the Court below because of its insufficiency, taken *per se.* By the Act approved 24th December, 1821, T. R. R. Cobb's Digest, 460, the Judges of the Superior Courts of this State are required,

(after the next election of Judges,) to convene annually at the seat of Government, " for the purpose of establishing uniform rules of practice throughout the several circuits of this State." And it is made the duty of the Judges so convening to notify absent Judges of such rules, or alterations of rules, as may be so established.

In the passage of this Act it was the manifest intention of the Legislature to refer to the sound discretion of the Judges, educated in the science and experienced in the practice of the law, those numerous minor, yet important, regulations, necessary to facilitate the proceedings of the Courts, to prevent unnecessary delays, and to forestall undue advantages which the ingenuity of one party might secure to him over the other. We think this discretion was wisely and properly reposed. It was not reposed in each Judge, severally, to be exercised in the circuit in which he had been specially elected, but in a convention of all the Judges, bringing together their wisdom and experience separately acquired, a discretion to be exercised by the majority for the government of all and each. It was manifestly the intention of the Legislature, that each Judge should conform to the rules of practice thus established, whether they chanced to meet his approval or not, otherwise one great object distinctly stated in the Act, " the establishment of uniform rules of practice in the several circuits," must fail.

In obedience to this Act, the Judges of the Superior Court have assembled and established, and from time to time altered rules of practice, as well known to the profession as the laws of the land. The 53d rule is in these words : " All grounds of motion for non-suit in arrest of judgment, and *for continuance*, etc., must be urged and insisted upon at once. And after a decision upon one or more grounds, *no others afterwards urged will be heard by the Court.*" We understand the learned Judge in the Court below to have placed his refusal to entertain the grounds presented in the second showing, made in support of the motion for a continuance, upon this rule of practice. There can be no question that the rule embraces the case and sustains the decision.

We must not be understood as holding, that this rule properly construed denies to the Judges of the Superior Court, severally, the discretion in every conceivable aspect of a case, to continue it after one application refused to the same party.

If this were an Act of the Legislature instead of a rule of Court, it would be open, like all other statutes, to construction, and whenever a question arose under it, an important point to be considered would be, whether the case at bar came within its purview, within its spirit and meaning. For instance, a case might arise in which a fact relied upon for continuance did not exist at the time when a motion, previously decided, was made, as the sudden and violent seizure by disease of an important witness actually in attendance on the Court, or the illegal and willful departure of such a witness, with the avowed purpose of withholding his testimony, or even of ignorance of the existence of a sufficient ground, (afterwards discovered,) under circumstances exonerating the applicant from the imputation of fraud or laches, or other like cases.

In all such cases, however, it is most clear that the affidavit of the party presenting additional grounds, after motion refused, should state the causes relied upon to relieve him from the operation of the rule. The rule itself is not to be capriciously or carelessly infracted. We see nothing whatever to withdraw this case from its operation. To have disregarded it would have involved a very daring exercise of discretion. We cannot condemn as error simple obedience to a rule, having the force of law, in a case equally within its letter and its spirit, still less should we be justified in doing so where, as in this case, the record informs us, that there were circumstances which satisfied the presiding Judge of a want of good faith, on the part of the prisoner, in thus presenting his application for continuance.

It would seem, from the second ground taken in the motion for a new trial, that there had been a third attempt to procure a continuance, but it is not so stated in the bill of exceptions, and is expressly ignored by the Judge. In any

event, however, such third attempt must have shared the fate of the second, and for the same reason.

The next exception is, that the Court refused the motion for a new trial, on the ground that the verdict is contrary to law and to the evidence.

2. The evidence discloses a previous grudge entertained by the plaintiff in error against the deceased; threats uttered by the former against the latter; a clear intimation of an intention to use a deadly weapon against him when opportunity should serve, and prisoner's acknowledgement of one previous movement towards reeking his threatened vengeance, postponed upon second thought from prudential considerations, with a superadded declaration of continuing intention to execute it. It also appears that the plaintiff in error and his father, (a co-defendant in the bill of indictment,) on the occasion of the killing, passed by the deceased, then stopped, and after a short colloquy returned to him; that the father sought a controversy with deceased, and struck him; that the plaintiff in error, standing by, did not interpose until the deceased had returned the blow received from his father, and then, instead of attempting to separate them, and prevent further conflict, inflicted a blow *upon the head* of deceased, with an instrument, and with a degree of violence, very likely to produce death, *when aimed at the head, and not likely so to do if aimed at any other portion of the body;* that deceased having been felled to the ground by this blow, the father of the plaintiff in error threw himself upon his person, and continued to beat him, plaintiff in error standing idly by until another had come to the rescue and separated the combatants.

We are not surprised that in all this the jury found abundant evidence of express malice, on the part of the plaintiff in error, of a conspiracy between father and son against the deceased, and that the mortal blow (not necessary in defence of the father) was inflicted with intention to kill the deceased. In these facts the law recognizes all the ingredients of the crime of murder, and we should be obstructing the administration of public justice by interposing on this ground.

Wilson *vs*. The State of Georgia.

3. Lastly, the charge of the Court is excepted to, and the exception goes not to any rule of law laid down for the government of the jury, but to an illustration, by way of example, employed in the course of the charge. Following a previous illustration, the Judge said, " or, in the case put by the Solicitor General, if a man in a crowded thoroughfare, with a reckless disregard of human life, fire a gun at a bird, in the direction of the crowd, at the manifest risk of killing some human being, although he may have had no particular malice against any one in the crowd, and no positive intention to take the life of any individual, yet if he killed a human being instead of the bird, under such circumstances it is murder." This was in illustration of the principle that there may be cases wherein homicide would be murder, though there may have been no positive intention to take the life of the deceased.

Did we hold that the conclusion arrived at by the Court, in the fictitious case of the bird and the crowd, was erroneous, it would be difficult to conceive how it was calculated to prejudice the cause of the prisoner. Had the Court, in the supposed case, charged the jury that the killing of a man instead of the bird would not have been murder, no intelligent jury would have found in that charge authority for acquitting the prisoner in the case at bar.

The supposed and the real cases were not at all analogous. The prisoner unquestionably aimed at the man he struck, and at the only part of his person probably fatally vulnerable with the instrument used, and with a degree of force which crushed both the instrument and the skull stricken. Whether he would have been a whit safer, in legal contemplation, had he shot at a bird flying or perched between him and a crowd of men, within deadly range of his gun, and killed a man instead, may be considered whenever the case shall arise. It is enough that the illustration used was not calculated to mislead the jury, and in our opinion did not mislead them. So far as the *plaintiff in error* is concerned, we think the law has but had its course. Beyond *his* case, we are not called on to review the verdict.

Let the judgment be affirmed.