## PARKS *v.* THE STATE.

Where in a prosecution for murder it was the theory of the State that the accused wilfully and maliciously shot and killed the deceased, or, if that be not true, that the accused so recklessly and negligently fired his pistol as made the shooting of the deceased, from which his death resulted, the natural result of such firing; and where it was contended by the defendant that the shooting occurred between midnight and break of day on a very dark night; that being attracted by a noise he went to the end of the house and discovered an object in his yard, which he hailed, and receiving no response, and believing it to be a predatory animal, fired at it and killed the deceased, *Held:*

1. That the declarations made by the deceased as to the cause of his death and the person who killed him were admissible if at the time of making them the deceased was in extremis and conscious of his condition.

2. That the law of voluntary manslaughter was not applicable to the facts of the case, and there was no error in failing to charge the law applicable to that offense, but the law of involuntary manslaughter was involved.

3. It was error for the judge to have charged in this case the law of justifiable homicide, as set out in section 73 of the Penal Code. The provisions of this section have no application under the facts of this case as shown by the evidence. The principles of law therein embodied are only applicable in cases of mutual combat, and do not.

apply in any case unless the evidence or some portion of it shows; that there had been a mutual altercation between the parties.

Argued July 5,—Decided July 26, 1898..

Indictment for murder. Before Judge Reese. Hart superior court. March term, 1898.

*A. G. McCurry,* for plaintiff in error. *J. M. Terrell, attorney-general,* and *R. H. Lewis, solicitor-general,* contra.

LITTLE, J. Allan Parks was indicted and found guilty of the murder of Walker Brown. The verdict was accompanied with a recommendation to life imprisonment. The evidence of the attending physician showed that the deceased died from a gunshot wound inflicted in the back just below the shoulder-blade. The effect of the shot was a complete paralysis of the lower extremities and a loss of sensation and motion. The testimony of J. F. Marett was to the effect that deceased was shot centrally in the back, close to the spinal column, and died on Sunday evening. The witness further testified as follows: On Saturday before his death, he told me that his condition was bad; that he knew he was going to die; that half of him was dead at that time, and that he was dying then. He said that Allan Parks shot him; that he had been working for Allan the day before, and Allan had promised him, if he would meet him at his house at four o'clock the next morning, he would let him have some whisky; that he went to Allan's house and was standing in the yard opposite the house when Allan Parks and another negro man whom he took to be Ben Parks, drove up; that they drove the horse to the back end of the house, and accused jumped out of the buggy and came slipping into the front yard and cocked his pistol; that he tried to tell him not to shoot, but that he did shoot at him, and deceased fell over and could not speak for a while; he then called for help. Deceased further said that he wanted Parks prosecuted, and that he had sent for witness to make the statement so that he could be a witness on the trial. Deceased was twenty-two or twenty-three years old, and unmarried. The mind of the deceased at the time he made the statement was in its normal condition.—Sam Williams testified for the defendant that he was at the house of the accused when

Brown was shot; that the accused and his wife lived there.
He saw Allan Parks immediately before the shooting. He had
gone home with him. They had gotten together on Tuesday
morning in South Carolina below Fair Play. Accused and his
brother were then going to the mountains. They were met by
some men who told them they had better not go. Allan then
said he believed he would not go. They crossed Tugalo River
at Shealer's ferry and returned to Allan's house, which is lo-
cated near a public road. It was something after midnight
when they got to his house, and they drove up to the back of the
house. Accused then requested him to take out the mare, and
said he would go in and see how his wife was and also get some
corn to feed the horse. The accused then went in the house.
It was a very dark night, but witness heard accused go in the
house, and after a while heard him call out, "Hello, who is
that?" like he was talking to somebody; he spoke in a loud voice.
He was at one end of the house, and it seemed to witness to be
the end where the chimney was located. Witness heard the hal-
loing before he heard the pistol fire. Did not hear the party
whom accused was calling return any answer. After that, wit-
ness heard the pistol-shot and then heard a man speak. After
the pistol fired, deceased said: "Allan come and help me home
now. You have shot me through and through." Allan then
came back and told witness to go to him, and said that if Walker
had spoken, he never would have shot him. Deceased, hearing
witness's voice, called to witness to come and help him, saying
that he was shot all to pieces. Witness went to him, picked him
up, carried him in the house, and put him in a comfortable posi-
tion, and the accused went to get some one to go after the doc-
tor. Witness did not know how far the accused was from the
deceased when he fired. It all took place at Allan's house, and
around at the chimney end of the house. Witness never saw de-
ceased until after he fell; found him in the yard; did not know
whether he could walk after he was shot or not. Witness heard
him fall, but did not know whether he was in the yard when he
was shot or not, nor did he know whether or not he fell as soon
as he was shot. Witness saw him in about a minute after the
time he heard him fall. Witness did not know how far the de-

ceased had moved from the place where he was shot before he found him. The accused was at the chimney end of his house when witness heard him hail the man. The pistol was fired back there.—John C. Linder testified that the house in which Allan Parks and his wife were living, at the time the deceased was shot, was located about twenty feet from the road. It was uninclosed. There were two doors to the house, one in front, one in the rear. The chimney is in the end of the house; one door next to the yard and one door behind; no door in the end of the house.—Tugalo Linder, sworn, said: I am the brother-in-law of the defendant. I went over to Allan's house, the morning after Brown was killed, and saw fresh tracks behind the chimney. I knew deceased well. They were like his tracks. They were barefooted tracks. I had seen the deceased barefooted, and thought the tracks were those of the deceased. It had been raining the night before—not enough to obliterate the tracks, which were located around at the back of the chimney. I noticed that the tracks crossed the yard to where he fell. Deceased lived eight or ten days after he was shot.—In his statement the accused said, that Walker was at his house on Saturday, Sunday, and Monday before Christmas. On Monday I told him I was going off, and where I was going. I was not to return until Wednesday night or Thursday morning. I was going up in the mountains, but turned back. I went a short distance because my brother told me he knew where we could get liquor enough for Christmas. We turned and came back by Shealer's ferry and hurried on home, where I had left my wife sick. I got home a little after twelve o'clock at night and drove up in the yard, and told Sam, who was with me, to take out the mare; that I would go in the house and get some corn, and see how my wife was getting along. I knocked at the door, my wife opened it, and I inquired how she was. I was in a hurry to get back to Sam and went through the house and into a room where I had some corn in a barrel. I got out the corn and took my pistol with me and started around the house. When I stepped out of the door, I heard a noise at the corner of the house in the stalks of cotton. I took my pistol in my hand and stepped out. I was very much alarmed, but could not see any-

thing; turned back to the side of the house, near which the cotton-rows ran; I looked up in the chimney-corner and discovered something apparently in the shape of an umbrella. I called and asked, "Who is that—what is it?" There was no response. I discovered that the object was moving, but could not tell whether it was coming to or going from me. I then fired at the bulk that I saw. When I fired it looked like something rolled up and went to the left. There had been a rumor that something had been killing dogs, and I thought it was a bear, and I just turned around to go back and get a light when the deceased halloed and scared me so bad I could not tell his voice. I asked, who was that; he said, "Me." I said, "Me who?" At last he said, "Walker," and I said, "What in the world are you doing there?" He said, "I was not after you." Those were the first words he spoke. He said, "Don't shoot me any more; you have killed me now." I said, "What made you run?" He said, "I did not want you to see me." I then turned and went back around the house to where Sam Williams was. Sam asked me who it was. I said it was Walker Brown. If he had spoken, I never would have shot him; and I said, "Sam, you go to him. I am not going to him; he may have a pistol and shoot me." I got Sam to go to him, and I told Sam to carry him in the house, and I went with him and we laid him down before the fire, and I told my wife to warm some bricks and irons and use them until we got the doctor. After we had laid Walker down, I asked him what made him do that. He said, "Allan, you did not do any more than any other man would have done." I said, "What made you run?" He said, "I didn't want you to see me." I had never promised to meet him.

The accused made a motion for a new trial, the first three grounds of which are, because the verdict is contrary to evidence and without evidence to support it; that the verdict is decidedly and strongly against the weight of the evidence, and contrary to law and the principles of justice and equity. The motion contained other grounds, which will be duly considered. As the case goes back to be tried again under principles of law not submitted on the trial in which the present verdict was rendered, we make no ruling on the grounds that the verdict is contrary to the evidence, etc.

1. In the fourth ground of his motion the plaintiff in error complains that the court erred in admitting evidence of the dying declarations of the deceased, because the same are insufficient to go to the jury as dying declarations. We find no error in admitting this evidence on the grounds taken by the movant. Section 1000 of the Penal Code authorizes the admission of evidence of this character in prosecutions for a homicide, when the person is in the article of death and is conscious of his condition. At common law dying declarations were admitted only from necessity. *Battle* v. *State,* 74 *Ga.* 101. But under our statute, such may be proved even when there is other evidence of the homicide and the circumstances attending it. It is a sound principle, however, that in the admission and use of dying declarations, great caution should be observed. *Campbell's* case, 11 *Ga.* 374; *Mitchell* v. *State,* 71 *Ga.* 128. Under the provisions of our Penal Code, supra, such declarations of the deceased are confined to the cause of his death and the person who killed him. It was shown by the witness, that at the time of the declarations the mental condition of the deceased was not affected. It was also shown that he declared himself conscious of his dying condition, that his lower limbs were at that time paralyzed from the effects of the wound, and that he did in fact die the next day. Even if any portion of this evidence was objectionable, taken as a whole, it was certainly sufficient, under a proper construction of our statute, to go to the jury as a declaration of the deceased relating to the cause of his death and the person who killed him.

2. Another ground of the motion for a new trial is, that the court erred in failing to give in charge to the jury the law of voluntary manslaughter, which is defined by our code to be the unlawful killing of a person without malice or deliberation, but upon a sudden heat of passion; and there must be either an assault on the person killing, or an attempt by the person killed to commit a serious personal injury on the person killing, or other equivalent circumstances to justify this excitement of passion. In the present case the accused did not claim that the homicide was the result of passion. On the contrary, it was the theory of his defense, emphasized by his statement, that the killing was not intentional; that he did not know that the object

at which he fired was a human being; and it is difficult to see, under the evidence as it appears in the record, how the law of voluntary manslaughter can be made to apply. A man has a right to eject an intruder from his house or premises, and to use such force as is necessary to accomplish that purpose; but a civil trespass on the land or property of another, not his dwelling-house, is never sufficient to reduce the intentional killing of the trespasser, with a deadly weapon, from murder to manslaughter. *Hayes* v. *State,* 58 *Ga.* 35. However this may be, the law of voluntary manslaughter should not have been given to the jury, under the defendant's theory of the case and his contention as to the manner of the homicide.

It is also complained that the court failed to give in charge to the jury, although no request so to do was made, the law of involuntary manslaughter; counsel for plaintiff in error insisting that the statement of the accused rendered the law touching this grade of homicide applicable. The statement of the prisoner is not evidence; and while it is the duty of the trial judge, without a request, to charge the law applicable to all the theories of the case raised by the evidence, yet as the statement is not evidence, it is not his duty, without a request, to charge a theory of the law which is raised solely by the statement of the accused. Had the request been submitted so to charge, we think that the law of involuntary manslaughter should have been given, as in our judgment it was directly applicable to the circumstances of the homicide as stated by the accused. According to his theory the deceased was a trespasser upon his premises, and one concerning whose presence, in view of the time, place, and circumstances of the trespass, the defendant had a lawful right to inquire and repel. While one has not the right to slay another who trespasses on his land or property, without more, it is yet a duty which a man owes both to his family and himself, to ascertain the motive of one whom he discovers on his premises under suspicious circumstances, and to prevent the invasion of his house and immediate premises; and such duty becomes more pressing in the darkness of the night than in the light of the day. It was the right of the accused, on hearing a suspicious noise, to inquire into it. It was not his right, if he had dis-

covered the object to have been a man concealing himself, to fire and kill him, nor, without more, to fire at a man under such cir-cumstances with the intention to kill him. The defendant in his statement, however, contends that his suspicions were aroused by hearing a noise at the end of his house, that he went there and found an object in the corner by the chimney, that he had no idea it was a man, but thought the object in the darkness of the night was a predatory animal; and it was under these cir-cumstances, after having called to ascertain more definitely what the object was, and receiving no reply, when the object moved, that he fired. If this statement of the circumstances attending the homicide be true (and whether so or not the jury is to de-termine), then the homicide could not be an intentional killing; nor if they be true could the killing be held such a negligent and reckless use of a deadly weapon as would authorize a verdict for murder. The circumstances of such a case make no parallel to one where a person fires recklessly into a building where people are congregated, or into a crowd gathered on the street, without intention to cause the death of any one. In the latter case, the slayer could not justly claim that his act of firing was done without intention to take life, because taking life would be the natural result of his act. Whether the accused, if he took the life of the deceased under the belief that the object at which he fired was an animal trespassing upon his premises, would be held to be engaged in the commission of a lawful or unlawful act, does not affect the question; but if the deceased was slain without any intention on the part of the accused to shoot a human being, under circumstances which did in fact induce him to believe that the object at which he fired was an animal tres-passing upon his premises at night, he would not be guilty of any offense greater than involuntary manslaughter. We do not of course pass any opinion on the sufficiency of the evidence to support this contention of the accused. Whether he wilfully and with malice aforethought slew the deceased, or whether as contended by him he fired at an object trespassing on his prem-ises, which in the dead of night he had no reason to believe was a human being and which he thought was an animal, was a question of fact to be determined by the jury. Had he re-

quested an appropriate charge as to this law, it should have been given.

3. Another assignment of error is, because the court gave in charge to the jury, as applicable to the evidence in the case, the principles of law declared in section 73 of our Penal Code, in which is used the following language: "If a person kill another in his defense, it must appear that the danger was so urgent and pressing at the time of the killing, that, in order to save his own life, the killing of the other was absolutely necessary; and it must appear also that the person killed was the assailant, or that the slayer had really and in good faith endeavored to decline any further struggle before the mortal blow was given." This section of the code contains principles of law wholly inapplicable to cases like the present. The accused rested his defense on the theory that the homicide committed by him was the result of misfortune or accident, and entirely without intention. Whether this be true or not, there was nothing in the evidence to which the section of the code above quoted could be made applicable. There was no mutual combat, no evidence of any struggle, and no necessity for the slayer to retreat. The accused did not claim that the homicide was justifiable, but insisted that the deceased was killed as the result of misfortune; while the State claimed that the act was premeditated and voluntary, or the firing was so recklessly and negligently done as to make the act murder. Under either of these theories and under any view which may be taken of the evidence, the charge given was error. The provisions of the section referred to apply in very many cases of homicide, but they have no application in any case unless an altercation between the parties precede the act of homicide.

4. It is unnecessary to rule on the other assignments of error contained in the remaining grounds of the motion for a new trial, inasmuch as the principles of law ruled above determine all the questions raised.

*Judgment reversed. All the Justices concurring.*