### COLLIER *v.* THE STATE.

1. The conviction of the defendant not resting on circumstantial evidence alone, a new trial will not be granted because of the failure of the court to charge the rule applicable to the sufficiency of such evidence to authorize his conviction, there being no request for such instruction.

2. Where the case is one wholly of circumstantial evidence, this principle must be given in charge without request.

3. While it is error for the trial judge to give instructions to the jury not based upon evidence, he can use illustrations to explain the meaning of an instruction given to the jury, care being taken not to mislead or confuse the jury, or to prejudice the defendant's case in their eyes.

4. Where the trial judge, in charging the jury, correctly states the law governing the case, but exception is taken to an illustration used by the court, explanatory of the instruction given, this court will not narrowly scrutinize the illustration, if satisfied that, whether right or wrong, it was not calculated to mislead, and did not in fact mislead the jury.

5. The court did not err in charging section 1018 of the Penal Code upon alibi as a defense; the error alleged being that it put upon the defend-

ant the burden of showing that it was impossible for him to have been present at the scene of the crime.

6. The burden of establishing the defense of alibi, when set up as a defense by the defendant, rests upon him; and in order to establish an alibi the evidence must be such that it was impossible for him to have been at the scene of the crime when it was committed.

7. The verdict is supported by the evidence.

No. 3280. August 17, 1922.

Indictment for murder. Before Judge Searcy. Lamar superior court. April 15, 1922.

Will Collier was indicted for the murder of Vannie Banks. The body of the deceased was found by the side of the railroad just below the crossing in front of H. L. Abernathy's house, 75 or 100 yards from his house, between the latter and Goggins station, close to the railroad on the right of way, about ten yards from the railroad-track. There was a gash in the throat along the neck, and signs of beating, cuttings, and laceration on the body. The kind of instrument used in making these wounds was some hard instrument, such as a stick. An oak stick was lying by her side, and some kind of a sharp instrument. The stick was bloody all over. Her coat was also bloody. The wounds on her person were sufficient to cause her death. At least fifteen of them would have caused her death. She was cut all around the neck. It was a bad cut. Her finger was broken, and her right arm was broken high up. Her body was found about one o'clock in the afternoon. She had been dead apparently ten or twelve hours. When the body was discovered the defendant was plowing in his field. B. F. Goggins went over to where he was, and told him to take out and go to the house. He kept on plowing, and wanted to know what to go up there for. He was told that the deceased was dead. He plowed to the end of the row, came back, started again and went ten feet, and Goggins again told him that the deceased was dead. He said, " You don't think I killed her ? " The witness told him he did not know. The defendant then unhitched the traces and walked off six or eight feet. He got on his mule and went to the house. The defendant had on a shirt and overalls. There was blood in a wrinkle on his shirt. It had dried " right smart." When mashed it would scale off. Some beer was found in his house. He was arrested. He asked what his bond would be for this whisky and this killing. He was told the latter was not a bondable case. After they got down to the railroad Goggins told him to go down and

see Vannie. He said he did not want to see her. He was asked a second time to go and see her. He folded his arms and looked in a different direction. The deceased lived four or five hundred yards from the place where her body was found. There was a " right smart " scuffling on the ground where the body was found. It was torn up for a space of eight, ten, or twelve feet in diameter. The defendant lived on the Poe place, about a mile from the place where the body was found.

Jennie Walker testified that she went to a society meeting at Bethel. The next day the body of the deceased was found. Will Collier was at the society. Saw him with a green oak stick in his hand. If this stick (referring to the one found at the body of the deceased) is not it, it was mighty like it. The defendant had on a light overall suit, overalls, jumper and all. The jumper is the jacket or coat for the overalls. We turned out about ten o'clock. The church is about a half-mile above Abernathy's crossing. Saw Will Collier, and swears that is the stick. It is not just as it was when I saw it that night. It was not split up. It was a green stick. Don't remember that I said I never saw Will Collier with a stick at the society that night. Henry Fletcher asked me about it. I said, " Go away from me with this nigger mess." I said I was not studying him. If I said that there was a stick I would have to go to court. Shug said if I saw it to say it, and if I didn't see it say I didn't see it. I didn't tell him that I didn't see the defendant with a stick at the church. I meant I didn't want to have anything to do with it. My mind is a little off sometimes, but it is not off now. We had one big lamp in the middle of the floor and one small one on the table What attracted my attention to the stick Collier had was his knocking with it.

Shug Dumas testified: I remember the time Vannie Banks was killed. I remember the commitment trial of Will Collier, held at Forsyth. Saw Will Collier down there. Saw his wife there with him that day. He said to her, " If you don't get me a jacket I will be lost." I don't know what he referred to. The jacket was given him, and then he went on the stand and testified. He said that was the jacket he wore that night at the society meeting. It was a man's clean blue jacket. It had not been worn. `Saw no stain on the jacket. The defendant is my uncle

by marriage. Jennie is my wife's sister's daughter.— Cross-examination: This woman was a first cousin to Will Collier. He is my wife's sister's son.

H. L. Abernathy testified: On April 29, 1920, I lived three eighths of a mile on this side of Goggins station toward Barnesville. It is on the west side of the station. I know the negro church called Bethel. It is on the west side of the station, about the same distance to my house. I suppose it is three quarters of a mile to the station. My house is a little over half way between the church and the station. I live on the south side of the railroad coming toward Barnesville. I remember the night this woman lost her life. I heard a struggle near my house that night, about seventy yards from the house. It attracted my attention. I first saw them on the side-track. He first struck her there. I saw them walk down on the railroad-track. When he struck her she kinder fell, but caught herself, got up, turned her face up the railroad, and he struck her again. She then ran five or six steps, leading from the railroad, down the embankment, holloaing, and when she got on the level ground he hit her again and knocked her down, and she got up and started towards the house. When she got near to a pear tree and when nearly under it she fell down and he kept beating her. I thought he was whipping her. I said, " If you don't stop you will kill her." I heard her say, " Will, don't do that." I leveled my pistol, but it did not fire. I took the pistol down, as it would not fire, and turned it with my hand, and then it fired. She quashed down. He stayed four or five minutes after the report of the pistol. He went off back up the road on the north side of the railroad-track. That occurred very near 12 o'clock at night. The moon was shining as bright as day. I could see it all good. I know it was Will Collier. I have known him twenty-five years. He has lived around the station there. I had an opportunity to see him. He was with that woman there that night. That is my best belief. I would not say positively. I have seen this stick before. Was not there when they found it. There was blood on it, or it looked like blood.

Cross-examination: My house is thirty or forty yards from the railroad. I was at home at ten or eleven o'clock that night I had not retired. Was at Mr. Ben Goggins' house until after

ten o'clock. This woman lived between my house and Ben Goggins' house. I had been home an hour and a half before I heard this noise. I was sitting up smoking my pipe. Nobody was living in the house with me. After supper I went to Ben Goggins.' Came back a little after ten o'clock. Was in bed when my attention was attracted to these people. Was in the rear room of the house. Was lying there, but not asleep. Had been lying there ten or fifteen minutes. Saw two people pass there. My bed was by the window. When he struck her I got up. It was seventy-five yards away when I first saw them. When the first blow was struck she made an outcry. She screamed and said, "O!" and kept holloaing and he kept beating her. Don't know how many places he hit her. It was pretty quick after he hit her when she came down the bank. When she got off the embankment he struck her again and she fell and caught on her hands and screamed out. Could not see him after she fell. Saw him, but his back was toward me. There were some peach-trees scattered across there. They moved the body the next day. I saw them near the body when they were going up the track. I did not go down there. I knew the woman had been beaten. I saw she could not get away. I did not hear what the fuss was about. Next morning I did not say that Will Brantley had given that woman a terrible beating. When I first saw them I thought it was Will Brantley or Will Barclay, and his wife Lula; but when they came down off the track I saw it was not him. Will Brantley is a little bit of a fellow. A great many negroes have the same shape and movement as Will Collier. Did not see his face. I did not look for his face. I was so sure it was him. I don't know as a matter of fact that it was Will Collier, but to the best of my knowledge and belief it was him. When I first saw them on the track they were right together. I saw them both. I thought it was Will Barclay and his wife. I have known the woman who was killed a long time. I testified at the commitment trial of Will Collier. I did not swear that it was not Will Collier that I saw, as I did not see his face. Judging by his form and shape I am satisfied that it was Will. I could not say what I stated down there, but it was pretty much the same that I state here. I said that I could not identify who the man was, only from his shape, form and movements. That is what I am testifying now. I

will say to the best of my judgment and the best of my knowledge that it was will Collier who killed this woman. I predicate that on his shape, walk, and movements. I came to that conclusion at that time when I saw him. Know John Bush, and told him when I first saw Will Collier I thought it was Will Barclay until he came down the track. Did not swear before the commitment trial that I did not identify the man as Will Collier.

John Bush testified: I live at Goggins. Was living there when this was woman was killed. Know H. L. Abernathy. The day after the killing I heard him say to somebody at one time that it was Will Barclay. He said that the one that did the killing was named Bill. Bill White was arrested first, Bill Barclay was the next one, and then Bill Collier was arrested. Mr. Goggins suggested that we go and see Will Collier, and we went to see him. When we saw him Mr. Johnson called my attention to the fact that he had on a clean shirt that morning. I have known the defendant twenty-five years. I know his character in the community where he lives. I consider that his character is good.— Cross-examination: Mr. Goggins called attention to Bill Collier's shirt. This looks like the same shirt that Bill Collier had on. He had on a clean shirt. He does not look like Will White, Will Brantley, or Barclay. There is no difficulty in distinguishing them from each other. This negro's character was good until he was convicted of the liquor business in two cases. Until he was convicted of the liquor business his character is not good. Would not consider anybody's character good who deals in liquor. Heard Mr. Abernathy express himself as to who it was that killed this woman. He said he thought it was liable to be one of the other Wills, but after he saw the man or woman come down the embankment he said he thought it was Will Collier up there, and he got on the railroad-track and Mr. Abernathy saw him; he thought it was the identical men that was up on the railroad track with the woman. I was there when he was carried up there. Thought they were carrying him over there to look at the body. He got on the railroad and would not go further. Don't think it was the purpose of carrying him over to look at the body.

Frank Bankston testified: I know Will Ben. Some called him Will Smith. I think he was pretty much the same size as Will Collier. He might have been a little taller than Will Collier. I

remember that the woman was killed. I heard of it. I don't know where Will Ben was. Don't know whether he was at the society meeting at the church or not. — Cross-examination: Don't know where Will Ben has gone. Don't know what has become of him. He is a little lighter in color than this negro. I know that he is larger than him.

John Howard testified: I live a half to three quarters of a mile to the negro church. I know the woman who was killed. I passed her house that night. I was going to her home that night. I found her there. That was about eight o'clock. She was not married. I went from there to the society meeting at the church.

Ed. Dumas testified: I know Vannie Banks. I remember when she was killed. I saw Will Collier the night the woman was killed at the lodge meeting. Saw him when he came there. He had no stick. I did not see him hammer on a bench with a stick. He did not hammer with it. There was no stick in his hand. Heard of the liquor charge against him. That was the only time I heard of his connection with any criminal charge. If he had a stick I did not see it. I did not look to see the stick. I did not look because I had met him at the door, and he did not have any stick.

Hunt testified: I was present at the commitment trial of Will Collier. Heard Mr. H. L. Abernathy testify on that occasion. My recollection is that he said that the man that did the beating was the exact size of Will Collier, was dressed like him, and·had the form of him, but he could not swear positively it was Will Collier.

John Howard testified: I remember the time this woman Vannie Banks was killed. I live in a half or three quarters of a mile from this church they are talking about. I went to her home that night. I found her there. It was about eight o'clock. I stayed there about ten minutes. She was not married. I went from her to the society meeting. Did not see Will Collier at her home that night. He came to the society after I got there. If he had a stick I did not see it. Did not see him when he came into the lodge room. Saw him after he sat down. Saw him after the society adjourned. Did not see him knocking anything with a stick. Did not see him with any stick. Saw Jennie Walker there. She was sitting half way down the house in her usual seat.

Cross-examination: Don't know whether he had a stick or not. He had on a jumper, and a suit of overalls like that he has on.

John Bateman testified: I remember the time this woman Vannie was killed. That night I was at the society meeting at the church. I live about two miles on this side of the church, at Mr. Banks'. I know Will Collier. Saw him there that night. He was a member of the society. He might have had a stick, and he might not. I did not pay that much attention to him. I did not see him with a stick. Saw him standing at the door. The position I held was to stand at the door and let members in. I let him in. — Cross-examination: He had on a jumper and overalls. Don't know whether he had on a jacket or not. Did not pay that much attention to him. — Redirect: Saw Jennie Walker there that night. She was seated middle way of the hall.

B. F. Goggins, recalled, testified: I knew the woman. Don't know that she was a woman of lewd character, or that that was her reputation. — Cross: I know the defendant pretty well. His reputation was good until this liquor business. He had on a new jacket at the commitment trial at Forsyth. It had not been worn or wrinkled. It was in nice shape. That was the one he claimed he wore at the society. He claimed that at the commitment trial. Defendant said the jacket he had on he was wearing the night the woman was killed. Did not see him with it on. The one I saw him with at the commitment trial was a clean one. I never saw the dirty one. I don't know that he had on a clean one when he killed the woman. I was investigating all that was suspicioned. They had got hold of two others. I knew the others, except that I did not know Will Benn. Will Collier had no jacket at the commitment trial. He was in his shirt sleeves. It was ten or fifteen days after the killing. — Redirect: Don't know how many children Vannie had. She was not married. Did not know her husband if she had any.

J. T. Johnson testified: I know Jennie Walker. Know her reputation for truth and veracity in the community where she lives. It is fairly good. From my knowledge of her reputation I would not believe her oath in a court of justice. I would believe some negroes on their oath. I mean that some would tell the truth and some would not. I know that she would not tell the truth

on everything. If she swore in a court of justice that she saw Will Collier at Bethel church at the society, I would say that she told the truth about it. I said that she would not tell the truth. I mean if she had any interest in it. If she came into court and said she saw a person, I could not tell whether she did or not. I know that she is capable of telling lies. I have no interest in this case. She had lived on my place. I have known her all my life. I have had business transactions with her, and she told me lies about that. She had a son-in-law who ran off, and I tried to locate him. That was the only lie she ever told me. It was about him. I was trying to catch her son-in-law at the time. I asked her if he was in Alabama, and she said that he was in Macon. I know she knew where he was.

The defendant made this statement: " I am as innocent as you is of this killing. I don't know anything about it. I was at that church that night. I went there to the society. I got there about the time the society opened up. I stayed there until it dismissed, and then I came back down the road by myself, and nobody walked with me. I stayed in the big road. I did not see anybody anywhere. When they came down with Mr. Goggins the next day he said to come out where Vannie Banks got killed. I asked them if she was dead. They said yes. They said to take out my mule and put her in the lot, and they took me on up there. When I got up there they set down in the road, and carried me up on the railroad and stood around up there. Mr. Goggins said, ' Do you want to see your cousin? ' I said, ' Yes sir.' They said to ask permission of Mr. Banks. I asked twice. He didn't say anything. I went to look for Mr. Banks. There were two more in the automobile. I turned around and looked at them. I didn't know anything about it, and — when they arrested me I didn't have any jacket on; and when they had me at the commitment trial, I went to the commitment trial, they asked me where the jacket was I had on at the society meeting. I said it was at home. They got in the car and went there. I had on overalls. I don't know whether the overalls are here or not, nor where my clothes are. I don't know where my jacket is now. If there were spots on it they were not blood. It might have been from where I made liquor the day before that. It must have been beer. I tell you the truth, that is all I know about it. I don't

know anything about the stick. When I went to the society I didn't have any stick. And I didn't have any when I left there. I never had any stick when I went into the society. I set at the door, but I didn't have any stick."

The jury convicted the defendant, with a recommendation. He moved for a new trial on the following grounds: (*a*) Because the court failed to charge the jury on the subject of circumstantial evidence. (*b*) Because the court erred in charging the jury as follows: " Malice is not necessarily ill will or hatred, but it is the deliberate unlawful intent, without justification, mitigation, or provocation, to take the life of a fellow human — the deliberate unlawful intent to take human life, whether it springs from ill will or hatred or jealously, or revenge, or the frenzy of drunkenness, or any unlawful motive;" the errors assigned being that the use of the words, " jealousy," and " frenzy of drunkness," was injurious to the defendant, because there was no evidence that the defendant was jealous of the woman; that there was evidence tending to show that she was a lewd woman, and the jury were in all probability impressed with the idea that the court had this in mind when he used these words; and the evidence tended to establish the fact that the defendant was an illicit distiller, and the jury may have thought that the court was referring to this when he used the words " frenzy of drunkenness," and this was calculated to arouse in the mind of the jury a prejudice against him. (*c*) Because the court erred in charging the jury as follows: " An alibi as a defense involves the impossibility of the prisoner's presence at the scene of the offense at the time of the commission; and the range of the evidence in respect to time and place must be such as to reasonably exclude the possibility of presence," the error assigned being that this charge put on the defendant the burden of showing that it was impossible for him to have been present, whereas under the law all that he had to show was that he was not there, or offer proof of such character as to raise the probability that he was not there.

The court overruled the defendant's motion for new trial, and error was assigned on this judgment.

*R. L. Berner, Claude Christopher,* and *B. H. Manry,* for plaintiff in error.

*George M. Napier, attorney-general, E. M. Owen, solicitor-gen-*

*eral, Seward M. Smith, assistant attorney general,* and *Persons &
Persons,* contra.

HINES, J. (After stating the foregoing facts.)

· 1. The case not depending on circumstantial evidence alone, a
new trial will not be granted because of the failure of the court
to charge the rule applicable to the sufficiency of circumstantial
evidence to authorize a conviction. Where the case is one wholly
of circumstantial evidence, this principle must be given in charge
without request. *Hamilton* v. *State, 96 Ga.* 301 (22 S. E. 528) ;
*Weaver* v. *State,* 135 *Ga.* 317 (2) (69 S. E. 488) ; The rule is
otherwise when the case is a compound of direct and circum-
stantial evidence, and does not rest upon circumstantial evidence
alone. *McElroy* v. *State,* 125 *Ga.* 37 (53 S. E. 759) ; *Nobles* v.
*State,* 127 *Ga.* 212 (56 S. E. 125) ; *Brannon* v. *State,* 140 *Ga.*
787 (7) (80 S. E. 7) ; *Cantrell* v. *State,* 141 *Ga.* 98 (7) (80 S. E.
649 ; *Mitchell* v. *State,* 151 *Ga.* 450 (107 S. E. 43). In *Scroggs*
v. *State,* 147 *Ga.* 737 (95 S. E. 226), there was a request to charge
this principle, which was refused by the court.

2. Error is assigned upon the charge of the court on malice.
This instruction is fully set out in the statement of facts. The
error assigned is that the court erred in using the language,
" jealously,  .  . or the frenzy of drunkenness," as there was no
evidence on which to base this language. It is elementary that it
is error for the court to give instructions to the jury not bottomed
upon evidence. *Dyal* v. *State,* 103 *Ga.* 425 (30 S. E. 254).

But the trial judge can use illustrations to make clear and
plain the meaning of an instruction given to the jury, care being
taken not to mislead, confuse, or prejudice the defendant in the
eyes of the jury. *Parker* v. *Glenn,* 72 *Ga.* 638 (5a), 649. It is
one thing to give an instruction not based on evidence, and quite
a different thing to illustrate such instruction by facts not in evi-
dence. It is not error for the trial judge, in an instruction to the
jury, to state hypothetical illustrations of a legal principle, unless
it be done in such manner as would imply that they were intended
to be used as facts which had been proved by the evidence.
*Sharpe* v. *State,* 48 *Ga.* 16. A reversal will not result from the
fact that the court in its charge referred, by way of illustration, to
evidence which was not in the record, provided that the jury were
referred to the testimony and directed to examine it for them-

selves; and were reminded that they were the exclusive judges of the facts, irrespective of any opinion which the court might entertain or express respecting them. *Stephen* v. *State,* 11 *Ga.* 225

Where the trial judge in charging the jury correctly states the law governing the case, but exception is taken to an illustration used by the court explanatory of the instruction given, this court will not narrowly scrutinize the illustration, if satisfied that, whether right or wrong, it was not calculated to mislead, and did not in fact mislead, the jury. *Wilson* v. *State,* 33 *Ga.* 207.

The illustrations given by the court tended to show what is meant in law by malice, and were apt illustrations of the idea intended to be conveyed. *Central Railroad* v. *Smith,* 80 *Ga.* 526 (4) (5 S. E. 772).

The real question in this case was the identity of the slayer. The element of malice was not an issuable fact, as the atrocity of the homicide clearly showed malice in the slayer. This instruction of the court on malice could hardly have misled or confused the jury.

3. The court charged *in totidem verbis* section 1018 of the Penal Code upon alibi as a defense. The complaint is that this instruction put upon the defendant the burden of showing that it was impossible for him to have been present. The burden of establishing the defense of alibi, when set up as a defense by the defendant, rests upon him; and in order to establish an alibi the state of facts relied on must be such that, if true, it was impossible for him to have been at the scene of the crime when it was committed. The proof must have such range, both as to time and place, that it would be out of the power of the defendant to have been where the proof of alibi placed him and also at the scene of the crime. The evidence on this subject must be such as reasonably to exclude the possibility of his presence at the scene of the crime. *Johnson* v. *State,* 59 *Ga.* 142; *Wade* v. *State,* 65 *Ga.* 756 (4); *Harris* v. *State,* 120 *Ga.* 167 (47 S. E. 520); *Hunter* v. *State,* 136 *Ga.* 103 (70 S. E. 643). The court did not commit error in its instruction on this subject.

4. The verdict is supported by evidence. We can not say that it is without evidence to support it. It has received the sanction of the trial judge.

*Judgment affirmed. All the Justices concur, except Gilbert, J., absent, and Hill, J., dissenting.*

HILL, J., dissenting.  I think the portion of the charge of the court, " whether it [malice] springs from ill will, or hatred, or *jealousy,* or revenge, or the *frenzy of drunkenness,"* etc., is erroneous, because it is not authorized by the evidence.  *Central Ga. Power Co.* v. *Cornwell,* 139 *Ga.* 1 (76 S. E. 387, Ann. Cas. 1914A, 880).  And it is especially harmful because there was evidence going to show that in another case the defendant had been indicted for selling liquor; but there was no evidence in this case that the defendant was drinking when the homicide occurred, as in the case of *Beck* v. *State,* 76 *Ga.* 452 (6), where a similar charge was given and approved; nor was there any evidence in the present case as to the defendant being jealous; nor did the court in the present case expressly state that the charge as to " drunken frenzy " and " jealousy " was used as an illustration, as in the *Beck* case.  If the court had stated that the reference was used as an illustration, the case would be different.