## JEFFORDS *v.* THE STATE.

1. On the trial of a man for the homicide of his sister-in-law, growing out of a difficulty in which her husband also was killed by the accused, evidence tending to show a previous difficulty between the accused and the husband (although such difficulty occurred several months prior to the homicide), and the existence of bad blood between them, was admissible as tending to show malice, intent, or motive on the part of the accused in killing the deceased.
2. The criticisms upon the judge's instructions to the jury on the subject of dying declarations are not meritorious.
3. Omission, in the absence of an appropriate request, to charge the jury on the law of circumstantial evidence was no error requiring a reversal, the conviction not depending entirely on circumstantial evidence.
4. The evidence supports the verdict.

No. 5421. JULY 15, 1926.

Murder. Before Judge Reed. Ware superior court. February 20, 1926.

*James R. Thomas & Son,* for plaintiff in error.

*George M. Napier, attorney-general, A. B. Spence, solicitor-general,* and *T. R. Gress, assistant attorney-general,* contra.

HINES, J. The defendant was indicted for the murder of his

---

Criminal Law, 16 C. J. p. 1040, n. 95; p. 1059, n. 39.
Homicide, 30 C. J. p. 159, n. 31; p. 184, n. 84; p. 312, n. 42.

sister-in-law. He was found guilty by the jury trying him, with a recommendation. He moved for a new trial; the motion was overruled, and to that judgment he excepted.

1. Jessie Jeffords, a witness for the State, testified as follows: "I recall some time in the past going with my father. We went over there. Papa was sick. We went there to kill some birds and to get some goats. Uncle Willis had sent us word that the goats were bothering him, and we went over there to get them, and we passed his brother's, R. R. Jeffords. He, R. R. Jeffords, came out and used bad language. That was on last.New Year's day. We saw Uncle Rob at his house. The bridge was floating; we had started to a big bridge on account of the little one being floating. When we got near his house he came out there using bad language—used it at Papa; he was in his yard at the time, and he, R. R. Jeffords, came out there with his knife and come up close, and Papa took his gun up and said he was going to knock him over, and he told me afterwards that is what he intended to do. I got scared and trotted the mule down the road, and so he went on into the house. I do not know what he tried to do with the knife; he came up and racked it that way [illustrating] at my father. My father had the gun to kill some birds; he had been at Bainbridge; my mother had been to the hospital there, and the water up there had made him sick, and he could not eat much, every and anything; and Mamma told him he might kill some birds over there in the field. He did not say nothing about the gun, just told him to kill the birds, that he might see some you know, that way." The defendant objected to the admission of this evidence, upon the grounds (a) that it was irrelevant, (b) that it was hearsay, (c) that it was prejudicial to the defendant, being an account of a difficulty which had occurred more than a year previous, and (d) that said evidence sought to show that there were words, without threats or any difficulty, which had been uttered approximately a year before the homicide, and was offered for the sole purpose of prejudicing his case before the jury.

The State introduced evidence tending to make this case: The deceased and her husband, the latter being a brother of the defendant, went to a neighbor's to borrow some fence-stretchers. When they got to the house of this neighbor, he told them to go to his barn and get the stretchers. They opened the gate leading

to the barn, and put the stretchers in the vehicle which they were driving. The deceased saw the defendant coming down the road in a wagon, driving his mule in a trot. The defendant had a gun across his lap and a pistol in his hand. The deceased was standing in the wagon just outside of the gate. The defendant drove up, and, without saying a word, shot the deceased. The deceased and her husband were doing nothing to the defendant at the time. The defendant jumped from his wagon, on the left of the road, crossed the road to the right, and took cover behind some trees, from which he advanced and shot the deceased. The mule to the wagon which the deceased was driving turned swiftly to the left, and the defendant again shot the deceased in the side and back with a load of buckshot. The husband of the deceased grabbed his gun, which was in the wagon that his wife was driving, and just as he grabbed it the defendant shot and killed him. From the wounds so received the wife died the next day.

We hold that the testimony so objected to was admissible as tending to show malice, intent, or motive on the part of the accused in killing the deceased. The weight to be given to such evidence was a matter for the jury. "Express malice is that deliberate intention unlawfully to take away the life of a fellow creature, which is manifested by external circumstances capable of proof," such as previous difficulties and ancient grudges. *Mitchum v. State,* 11 *Ga.* 615, 628; *Wilson v. State,* 33 *Ga.* 207, 217; *Brown v. State,* 51 *Ga.* 502, 505; *Henderson v. State,* 120 *Ga.* 504, 506 (48 S. E. 167); *Frank v. State,* 141 *Ga.* 243 (80 S. E. 1016); *Hill v. State,* 148 *Ga.* 521 (97 S. E. 442); *Williams v. State,* 152 *Ga.* 498 (110 S. E. 286); *Fairfield v. State,* 155 *Ga.* 660, 663 (118 S. E. 395).

2. The court charged the jury as follows: "It is for the court, in the first instance, to determine whether the preliminary proof is sufficient to admit dying declarations; but this ruling of the court is not binding upon the jury, for you must be satisfied beyond a reasonable doubt that the statement introduced as a dying declaration of the deceased was actually made by the deceased, and that she was in the article of death, and conscious of her condition at the time of making the alleged dying declaration. The rule of law upon this subject is this: Dying declarations made by any person in the article of death, who is conscious of his condition, as

to the cause of his death, and the person who killed him, are admissible in a prosecution for homicide. Great care is necessary in the admission and use of this kind of testimony. It is not necessary that the person whose statements are sought to be introduced should express herself as believing that she was in a dying condition. Consciousness of her condition may be inferred from the nature of the wound, or from other circumstances. Dying declarations, when the jury are satisfied that they were such, are founded on the necessity of the case; and the reason that, being made in view of impending death and judgment, when the hope of life is extinct and when retribution of eternity is at hand, they stand on the same plane of solemnity as statements made under oath." In his motion for new trial the defendant excepts to. this charge, on the grounds: (a) that the jury was thereby led to believe that the judge had passed upon the materiality and the truthfulness of the dying declaration submitted, for which reason he found the same to be admissible; (b) because the court in this connection did not charge the jury it was their right and their duty to determine from the evidence whether or not the dying declaration introduced was actually made by the deceased, that the same was made in the article of death, and whether the same was true; (c) because the court failed to instruct the jury that dying declarations should be received with great care and caution, and that the bias and the physical and mental condition of the declarant, as well as the credibility of the alleged declaration, should be weighed by the jury; (d) because the court failed to instruct the jury, in connection with the above charge, that whether they were satisfied from the evidence that such declaration had been made, and that the deceased was in the article of death and had knowledge of her condition, and that the declaration was true, were all questions for their determination exclusively, and were not questions for the court; (e, f) because the use of the language, "when the hope of life is extinct and when retribution of eternity is at hand, they stand on the same plane of solemnity as statements made under oath," was calculated to give undue emphasis to the weight to be attached to such evidence; (g) because, by the emphasis put by the judge upon the evidence of dying declarations, it took from the jury their province of passing judgment upon such declarations; (h) because the jury are the exclusive

judges of the weight to be given to dying declarations; (i) because the court should not have instructed the jury that the evidence offered as a dying declaration, and which he had determined was admissible on preliminary proof, was to be accepted by them as sworn testimony in the case and by them considered as such; and (j) because under such instruction the court expressed his opinion of the weight to be given to the testimony.

The criticisms on this charge of the court to the jury are without merit. The court did not pass upon the truthfulness of the dying declarations admitted. The court distinctly instructed the jury to determine whether the dying declaration admitted had been actually made by the deceased, whether she was in the article of death at the time she made it, and whether the same was true or not. The court expressly instructed the jury that great care was necessary in the admission and use to be made of dying declarations. The instruction that dying declarations stand upon the same plane of solemnity as statements made under oath did not give undue emphasis to the weight to be attached to such evidence, and did not cause the jury to accept the same as the truth of the case. The reason for the admissibility of dying declarations is founded upon the theory that the solemnity of the occasion is a safeguard of truth equal to, if not stronger than, a formal oath. *Hill* v. *State*, 41 *Ga.* 503; *Mitchell* v. *State*, 71 *Ga.* 128. Such evidence is admissible notwithstanding there may be abundant evidence as to the homicide and the circumstances attending it. *Battle* v. *State*, 74 *Ga.* 101; *Parks* v. *State*, 105 *Ga.* 247 (31 S. E. 580). In *Swain* v. *State*, 149 *Ga.* 629 (101 S. E. 539), the judge, after admitting dying declarations, did not instruct the jury that it was for them to finally pass on the question whether or not such declarations were actually made and were conscious utterances in the apprehension and immediate prospect of death.

3. In the sixth ground of his motion for new trial the defendant complains that the court erred in failing to charge section 1010 of the Penal Code, which declares when a conviction upon circumstantial evidence is warranted. The State introduced the dying declarations of the deceased, which tended to make out the case stated in the first division above. There was an eye-witness who testified to some of the facts of the difficulty which resulted

37

in the death of the deceased and her husband at the hands of the defendant. In his statement the defendant admitted the killing of the husband, and set up justification. There is no merit in the complaint of the failure of the court, in the absence of a written request, to charge the jury upon the law of circumstantial evidence, the conviction of the defendant not depending entirely upon circumstantial evidence. *Toliver* v. *State,* 138 *Ga.* 138 (74 S. E. 1000); *Brannon* v. *State,* 140 *Ga.* 788 (80 S. E. 7); *Mitchell* v. *State,* 151 *Ga.* 450 (107 S. E. 43); *Collier* v. *State,* 154 *Ga.* 68 (113 S. E. 213).

4. The verdict is supported by the evidence.

*Judgment affirmed. All the Justices concur.*